UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JED JOHNSTON                                                          PLAINTIFF

v.                                                    CIVIL ACTION NO. 3:08CV-33-DW

ROBERT BOSCH TOOL CORPORATION                                        DEFENDANT

## MEMORANDUM OPINION

This action for unpaid overtime wages came before the Court for trial on June 17, 2008.[1]  The parties have provided the Court with post-hearing briefs in support of their various claims and defenses (DN 53, 54).  Accordingly, the matter is ripe for consideration.

## OVERVIEW OF THE ISSUES

The primary question raised in this action is whether the named Plaintiff, Jed Johnston, is entitled to recover from his prior employer, Defendant Robert Bosch Tool Corporation (Bosch), unpaid overtime and regular pay pursuant to Kentucky wage and hour laws.  See KRS 337.285 (West 2008), 803 KAR 1:060, 1:070 (May 2008).  Johnston maintains that during his final five years employment with Bosch he was a non-exempt employee entitled to receive one and one-half times his hourly wage rate for hours worked in excess of a 40-hour work week.  See KRS 337.285(1) (West 2007).  Bosch maintains that Johnston was not an "employee" as that term is defined by KRS 337.010(2)(a)2 based on his administrative, supervisory and professional duties as a salaried environmental coordinator/plant engineer.  Johnston now seeks to recover over $500,000 in actual and liquidated damages.  See KRS

---

[1]  The trial was stenographically recorded by court reporter Dena Legg.  The trial transcript may be found at DN 42-45 of the electronic case file.

337.385 (West 2007).  Bosch claims that even if Johnston were considered to be a nonexempt

employee under KRS 337.285(1) (West 2007), he would be entitled to recover approximately

$22,000 at most.


## FINDINGS OF FACT

The facts set out below are taken from the testimony and exhibits offered during

the 4-day bench trial that commenced on June 17, 2008 (DN 42-45).  The trial is recorded in

some 864 pages of transcript that reflects the introduction of 93 trial exhibits.  (DN 42-45).  The

material facts are set out in some detail due to various duties performed by the Plaintiff over the

five years of employment at issue.


**a.      Jed Johnston.**

Jed Johnston, the Plaintiff, is a 60-year-old resident of Grayson County,

Kentucky, with a high school diploma, and one year of college business courses (DN 42, Trial

Tr. 7/18/2008, pp. 1-16, 1-17).  Jed began work at the Leitchfield plant now owned by Bosch on

March 9, 1970.  The plant, which produces carbide saw blades, was then owned by Vermont

American Corporation.  Emerson Corporation later purchased the plant, and in 1990, merged

with Defendant Bosch (DN 42, pp. 1-17).  Emerson managed the plant for the next five or six

years following the merger until Bosch took over management of the operation some time

around 1997-1998.  (Id. at 1-18).

Jed worked continuously at the Leitchfield plant for 35 years until he retired due

to disability on December 17, 2004.  He started his employment as an accountant for Vermont

2

American, a job he held until 1973, when he took the position of industrial engineer.  (Id. at 1-18, 1-19).  Three years later, in 1976, Jed became plant engineering manager and quality control manager.  (Id. at 1-19).  In 1989, Jed took on the job of new product design engineer, an exempt salaried position he held through 1998. (Id.).  When Jed took the job of design engineer, he had no formal training in draftsmanship, computer assisted design or carbide saw blade product development.  He is not a licensed engineer, has no formal educational training in engineering, and no college degree.

During the time that Jed was the new product design engineer, the Leitchfield plant increased it saw blade production from 4.2 million blades to 7.2 million and increased its employment from 150 employees to over 450.  (Id. at 1-21).  One of Jed's circular saw blade designs won multiple awards and was featured in a national advertisement during the half-time show of the 1996 Super Bowl game.  As new produce design engineer, Jed had direct contact with major corporate clients during this time and reported only to the plant manager.  (Id. at 1-20).  Jed does not dispute his exempt status up to this point in his employment.

Matters changed significantly for Jed in late 1997, when Bosch assigned a new engineering manager at the plant.  The new engineering manager was an individual named Brent Webster.  Webster became Jed's immediate supervisor in the engineering department. (Id. ).  Within seven months of starting work at the plant, Webster relieved Jed of his job as new product design engineer.  (Id. at 1-21).  According to Jed, Webster told him at the time that Jed had "too much power, too [many] ... connections."  (Id.).  Consequently, Webster restricted Jed from having any contact with the Bosch corporate engineering department.  He also was forbidden to contact salesmen or customers of the company or to visit other manufacturing

3

plants. (<u>Id</u>. at 1-22).

Webster instead assigned Jed, as part of his engineering duties, to be responsible for seven of twelve different manufacturing processes at the Leitchfield plant.  (<u>Id</u>.).  These seven manufacturing processes included: the grit blast and polish operation; two blade wash processes; two acid dip operations; a paint strip and paint operation.  As Jed described his new job duties, he was to monitor each process on a daily basis, whether it involved paints, acids, alkalines, soaps or grit blasting.  (<u>Id</u>. at 1-123).  This change in work responsibilities was not formally reflected in Jed's work title.  (<u>Id</u>. at 1-24).  He continued to be listed in the company phone directory as being a product design engineer for several more years, even though he did not have any design-related duties.

Jed testified that each of these seven processes had a standard procedures manual for it.  (<u>Id</u>. at 1-39).  Jed's job, according to him, was merely to monitor the equipment operators, pick up their weekly paperwork and check each process on a daily basis to see how it was proceeding.  (<u>Id</u>.).  Jed's view is that all he actually did was tabulate the information obtained from the operators and make sure that each process was in compliance with the specifications contained in the standard procedures manual.  (<u>Id</u>.).  If an operator had problems, Jed would contact the vendor of the equipment or chemicals involved to obtain assistance.  (<u>Id</u>. at 1-40).

Jed took on more new duties in 1998.  He also became the plant's environmental coordinator, after Fran Lazausky, another Leitchfield plant employee, returned to the manufacturing floor.  (<u>Id</u>. at 1-24).  Jed reported in this new job to John Young, the Bosch corporate environmental manager responsible for all plants. (<u>Id</u>.).  As environmental coordinator, Jed would be on the plant manufacturing floor on a daily basis to ensure environmental

4

compliance with laws relating to hazardous waste storage, labeling and disposal.  (Id.).  If an environmental problem needed immediate attention, Jed would contact the supervisor of the plant area involved to address the situation.  (Id. at 1-41).

In March of 1999, Webster assigned Jed even more duties.  Jed took over a third job of plant facility engineer from another retiring employee, Ralph Bliss.  (Id. at 1-25).  This job, according to Jed, involved maintenance of the Leitchfield plant inside and out, its OEM[2] equipment and the parking lots.  (Id.).  If problems with plant equipment arose that plant maintenance could not resolve, Jed was responsible to coordinate with the original manufacturer of the equipment to solve any such problems.  (Id. at 1-25).  He was also regularly assigned to open up the plant on weekends when contractors needed access.  (Id. at 2-789, 2-80).

Jed estimated that approximately 75% to 80% of his time was spent monitoring the seven manufacturing processes, along with performing his environmental coordinator duties.  (Id. at 1-26).  The remaining 25% of his time was spent with his plant engineering duties and various special engineering projects assigned to him by management.  (Id. at 1-27).  Jed's new job title of "plant engineer/environmental coordinator" remained unchanged, as did the percentage of time devoted to his new duties throughout the remainder of his employment.  (Id.).  One thing did change, however.  In July of 2002, Brent Webster left Leitchfield for corporate headquarters in Louisville, Kentucky.

The biggest part of Jed's time at work during the final five years of his

---

[2]  OEM is the abbreviation for "original equipment manufacturer."  While some of the equipment at the Leitchfield plant was manufactured by Bosch engineers, larger, more complex equipment was often purchased from outside manufacturers, who provided technical support to the Leitchfield plant for their equipment.

5

employment was spent shutting down one of the two Leitchfield plants and performing his environmental coordinator duties.  (Id. at 1-28).  The consolidation of Leitchfield plant nos. 1 and 2 began in 2000, and culminated four years later in 2004.  Jed's role in the closure of plant no. 2 made him responsible for cleaning and removal of all of the plant's manufacturing equipment, inspection of the facilities, cleanup and disposal of environmental waste.  (Id. at 1-29).  As environmental coordinator, Jed also routinely prepared environmental inspection reports, quarterly environmental reports, and reports for city and state agencies documenting the plant's environmental compliance.  (Id.).  Jed, had no formal training or degree in environmental compliance, just as he had no formal engineering training.  Consequently, he was unable to prepare the plant's air quality permit application, which was more complex.  (Id. at 1-30).  John Young prepared this report.

Jed denied that his engineering responsibilities for the seven manufacturing processes required him to exercise any independent judgment.  (Id. at 1-32).  He characterized his duties instead as merely being responsible for monitoring each process and keeping the paperwork on the chemicals used for each.  (Id.).  According to Jed, each of the seven processes was performed to specifications established by Bosch.  (Id.).  The OEM vendors provided technicians who trained the equipment operators, their supervisors and Jed how to perform periodic checks of each process.  (Id. at 1-32).  This supposedly was all standard procedure at the plant.  (Id. at 1-34).

Jed concedes that prior to 1999, when he was new product design engineer, he performed job duties that required him to exercise independent judgment.  (Id. at 1-88).  Jed testified that he performed only routine and repetitive duties week in and week out, however,

6

after his self-described demotion.  (Id.).  He claims he did not perform any work for Bosch after 1998, that required invention, imagination, originality, special talents, artistic or creative endeavors.  (Id. at 1-89).  Occasionally, Jed did perform physical work at the plant in the course of monitoring the seven manufacturing processes.  (Id. at 1-88).   Any skills that he acquired while employed by Bosch, according to Jed, were obtained solely by experience through his work.  (Id. at 1-90).

Although Jed was known as a "troubleshooter" at the plant, the real situation was far more simple, according to him.  Jed monitored the seven manufacturing processes on a daily basis and understood how the production line was to be run, i.e., the amount of chemicals used and number of blades to be manufactured.  (Id. at 2-46).  If a specific problem developed in a given process, he would contact the chemical supplier or the equipment manufacturer if the equipment operator himself, or his supervisor at the plant, could not solve the problem.  (Id.).  Jed would simply call the vendor who would send in a specialist to correct whatever problem arose.  (Id. at 2-47).  Jed would then stay with the specialist until the problem was solved.  (Id. at 2-48).

During his employment with Bosch, Jed never received a copy of his job description.  (Id. at 1-66).  At trial, however, Jed was shown the Vermont American job description for the position of "plant engineer/environmental coordinator" effective January 1, 2003.  (Id. at 1-44, 1-45).  Jed testified that, contrary to the job description for the environmental coordinator portion, he did not participate in the development of any hazardous waste rules or regulations, although he did provide training to company employees on hazardous waste management, used oil and storm water management, spill prevention and DOT emergency

7

awareness.  (Id. at 1-46).  The plant waste itself was disposed of by private contractors; Jed

consequently had no responsibility for its actual disposal.  (Id. at 1-47, 1-48).  Occasionally, he

would collect samples of waste water to send off for laboratory analysis. (Id. at 1-50, 1-51).  He

also assisted John Young in preparing a number of environmental compliance reports.  (Id.).  His

duties as environmental coordinator included assessment of alternative means for hazardous

waste treatment and disposal to eliminate waste and reduce costs.  (Id. at 1-52).

Jed also testified concerning the job duties described for the "plant engineer"

portion of Vermont American's job description. (DN 42, p. 1-52).  Jed agreed that he wrote

procedures for the operation of new and existing equipment as part of his plant engineer duties.

(Id. at 1-54).  He denied, however, that he redesigned, repaired or replaced in-process production

problems; that he recommended the incorporation of new technology; that he participated in the

planning and implementation of equipment design or revision; or that he prepared cost estimates

for the purchase of new equipment (DN 42, Pl's Exh. 1, job description).  Jed also denied that he

spent 50% of his time performing the duties of plant engineer as indicated on the same job

description.  (Id.).

Although Brent Webster provided Jed with a list of written job requirements that

indicated his time at work should be equally divided between environmental coordinator duties

and engineering projects, Jed testified that there was no way that he could equally divide his

time, given the "big projects" he was assigned, such as the plant no. 2 shut down and the extra

air permit paperwork he did for John Young.  (Id. at 1-60).  During his testimony, Jed also was

shown the Vermont American job description for the position of "environmental coordinator."

(DN 42, Pl's Exh. 3, job description).  On the face of the job description for environmental

8

coordinator appeared in bold capital letters the words, "non-exempt position description."  (Id.).

In contrast, the job description of "plant engineer/environmental coordinator" did not indicate

whether the combined position was exempt or nonexempt.

        Bosch never informed Jed during his final five years of employment whether he

fell within the exempt or nonexempt employment classification.  (Id. at 2-32).  No one at the

company ever provided him with a written job description or specific guidance on whether he

was classified as an exempt or nonexempt employee.  (Id, at 2-65).  Jed's belief was that Bosch

simply didn't classify his position one way or the other.  (Id.).  On a personal loan application,

Jed did describe his job as being an "engineer."

        Jed worked with two union employees, James Gary and Ernie Priddy after 1998.

Both men assisted him as needed to handle environmental hazardous and nonhazardous waste at

the Leitchfield plants.  (Id. at 1-90, 1-91).  Jed worked with Ernie Priddy until Leitchfield plant

no. 2 ceased production in 2000, when Priddy returned to work on the manufacturing floor.

(Id.).  James Gary worked with Jed throughout the entire final five years of Jed's employment.

(Id. at 1-91).  Jed estimated that he spent little time in 1999, working with James Gary, less than

40 hours total for the year.  He spent twice that amount of time in 2000, when plant 2 was

shutting down.  (Id. at 1-92).  After plant 2 closed, Jed and Gary returned to working less than 40

hours a year together.  (Id. at 1-92).  The situation involving Ernie Priddy was roughly the same;

Jed worked less than 40 hours a year with Priddy.  (Id. at 1-93).

        Jed estimated that he spent between 70% and 80% of his time performing office

work during his last five years of employment.  (DN 43, Tr. 7/18/2008, p. 2-4).  Essentially, he

would calculate the amount of chemicals used in each manufacturing  process on a daily basis

and record the numbers of saw blades run through the chemicals each day.  (Id.).  By

maintaining these totals, he could determine the number of saw blades that a gallon of paint

would cover.  Such statistics were used when choosing chemical vendors.  (Id. at 2-6).  During

this time, Jed had no contact with Bosch customers.  The forms that he completed were standard

forms that he had been trained how to fill out.  (Id. at 2-6).  Jed described his job duties as

nothing more than the repetitive, routine collection of paperwork on the seven manufacturing

processes, and environmental paperwork (Id. at 2-5).

Jed also completed applications for waste permits in addition to the other daily

paperwork.  (Id. at 2-7).  He estimated that his environmental compliance paperwork increased

tenfold from 1999 to 2004.  (Id. at 2-7, 2-8).  According to Jed, the work he performed at the

Leitchfield plant did not affect the business operations to a substantial degree.  He had no

authority to financially commit the company in any significant fashion and had no authority to

deviate from established company policies without prior approval.  Any contractors hired for

work at the plant were previously approved by Bosch.  He had no authority to negotiate with

them or to bind Bosch to contracts with outside contractors.  (Id. at 2-9).

Jed denied at trial that he provided any expert advice or planning for long-term

business objectives to the company during 1999-2004.  (Id. at 2-10).  He denied being involved

in any short-term planning of business objectives or in resolving any matters of financial

significance or management.  (Id. at 2-10).

Jed acknowledged on cross-examination, however, that his engineering

responsibilities included the requirement that he assist in drafting job descriptions for positions

on the manufacturing floor.  (Id. at 2-49, 2-50).  Basically, Jed helped the quality control people

at the plant with the preparation of job descriptions.  (Id.).  His role was to have the equipment operator verify the job description prepared by quality control.  (Id. at 2-51).  Once it was verified, he would sign off on the job description indicating that he had reviewed it.  (Id.).  If a particular job description needed to include additional duties, or to correct the duties described, Jed would note the changes on the proposed job description so that quality control could review them.  (Id. at 2-52).  For example, in 2000, Brent Webster assigned him to draft a "paint line" job description so that it could be resubmitted to quality control for approval.  (Id. at 2-54).  The job description included a requirement that called for the operator to dump out the soap tank on a weekly basis at the cost of $1,000 per week.  Jed knew that the tank could be operated properly for 5-6 weeks without being dumped.  He corrected the mistake in the job description, providing a substantial savings to the company.  (Id. at 2-55, 2-56).

Jed acknowledged that he submitted purchase recommendations for various pieces of manufacturing equipment that he felt would be beneficial to the company on several occasions. After it became clear to him that none of his recommendations would be approved, Jed stopped submitting such purchase requests to management.  (Id. at 2-62).  At most, he provided "some" consultation to management during the last five years of his employment.  (Id. at 2-63).  He admitted for example that he provided technical information to the company's saw blade plant in China on a problem with its acid dip process.  (Id. at 2-63, 2-64).  As Jed described his role, he merely provided a job description of the acid drip setup needed to produce a clean saw blank.  (Id. at 2-64).

**b.      Jed's Work Records and Memos.**

Throughout his employment, Jed kept detailed personal work records and calendars that reflected his hours worked on both a daily and a weekly basis, his vacation time and sick leave used.  (Id. at 2-17, 2-18, Pl's Exh. 5).   These records of his hours and work were kept in a series of binders called, "Jed's Work Binders."  (Id. at 2-173).  Jed kept track of the jobs that he performed each year in binders labeled, for example, "Jed's Year 2000 Job Descriptions."  (Id. at 2-176).  In separate binders, for example, labeled, "Year 2000, Jed's Cost Reductions," he kept track of the amount of money the company saved each year due to various cost reductions he either instituted or received credit for.  (Id.).

Jed's records show that he claims 1,105.5 hours of overtime worked in 2001 (Id. at 2-19); 1,209.3 hours of overtime in 2002 (Id. at 2-20); 1,209.3 hours of overtime for the year 2002 (DN 43, 7/28/2008 at 2-20); 1,207.9 hours of overtime in 2003 (Id. at 2-25); and 784.1 hours of overtime for his final year of employment until October of 2004, when he filed his overtime claim with the Kentucky DOL.  (Id. at 2-29).  These records are the basis on which Jed calculates the amount of unpaid overtime allegedly due him pursuant to KRS 337.385.

Jed also complained in writing during his final years at the plant about having long working hours.  Lengthy memos to plant management, including the HR director, Rita Stevenson, and plant managers Steve Lawson and David Goodling were introduced at trial.  (Id. at 1-82).  Jed complained in writing to Stevenson and to Elvis Vaughn, the Corporate Human Resources Director in Louisville, Kentucky, about not being paid overtime.  (Id. at 1-83).  By September of 2004, matters had come to the point that Jed formally complained to the Kentucky

12

Labor Department (DOL). about his employment situation.  (Id. at 1-83).[3]

Jed discussed several of the memos he wrote about the excessive number of hours he was forced to work due to his impossible workload.  (Id. at 2-34, Exh. 6, memo dated 11/05/04).  In one memo of November 2004, Jed protested that he had been assigned so much work that he was repeatedly forced to work through his lunch and rest breaks.  (Id., Exh. 6, ¶ 10). Jed made the same complaints about unfair workload distribution in a September 7, 2004 memo to Elvis Vaughn, the corporate human resources manager.  (Id. at 2-35, 2-36, Exh. 7, memo of 9/07/04).  Jed complained in his memos of being forced to work 60-80 hours a week while performing the responsibilities of two engineering job positions.  (Id., Exh. 7, p. 16).

During his employment with Bosch, Jed, a nonunion, salaried employee, received annual bonuses of varying amounts based on the performance of the plant.  For example, in 2004, Jed earned approximately $60,000 in his employment with Bosch.  His base annual salary at that time was $50,500.  (Id. at 2-160).  The difference in the two figures was his annual bonus that year.  (Id. at 2-67).  Union employees at the Leitchfield plant, which was a union facility, were not eligible for these performance bonuses.  According to Jed, however, some non-exempt salaried employees, including one employee, Ronnie Smith, an engineer, did receive overtime pay.  (Id. at 2-67).  Accordingly, Jed, a nonunion member, denied that as a salaried engineer at the Leitchfield plant, he automatically was classified as an exempt employee.

On June 30, 2005, Jed sent a memo to Kentucky DOL investigator Patty Major concerning his job classification and potential overtime claim.  (Id .at 2-74, Def's Exh. 2, memo

---

[3] No formal decision of the Kentucky Labor Cabinet was introduced at trial.  Apparently, the DOL determined Jed was exempt from overtime protection under KRS 337.285(1).

of 6/30/2005).  Jed explained in his memo that as plant environmental coordinator he was

assigned to "monitor and maintain guidelines set by EPA Agency to meet city, state and federal

regulations."  (Def's Exh. 2, p. 1).  These duties were performed "under the umbrella of John

Young," according to Jed.  (Id. at 2-74).

Jed listed 11 items on the first page of his memo to Patty Major that were a

summary of his duties as environmental coordinator for the prior five years.  (Id.).  This list

included the completion of: (1) a weekly plant environmental inspection report; (2) monthly and

quarterly plant environmental indicator reports; (3) quarterly plant environmental updates to the

general plant manager; (4) monthly and quarterly Bosch environmental metric system reports;

(5) annual monitoring of wastewater discharge; (6) annual monitoring of storm water discharge;

(7) two annual environmental plant permit applications; (8) four annual plant environmental

reports to the state and corporate headquarters; (9) annual RCRA, DOT and OSHA

environmental training requirements for employees; (10) annual employee training on hazardous

waste, used oil, florescent bulbs and storm water; and (11) handling the disposal of the plant's

industrial waste as needed.  (Def's Exh. 6, p. 1).

Jed indicated in his memorandum to Major that he spent half of his time

performing his duties as plant engineer.  (Id. at 2-76, Def.'s Exh. p. 2).  Jed described himself in

his memorandum of June 30, 2005, as being one of the engineers assigned to certain of the

operations to support manufacturing.  (Def.'s Exh. 6, p. 2).

In another earlier memo to DOL investigator Major dated April 12, 2005, Jed

discussed various special projects assigned to him.  (Id. at 2-81, Def.'s Exh. 3, memo of

4/12/05).  His view was that the duties he performed were done as a non-exempt employee under

14

the direction of his supervisor with outside contractors, vendors, and specialists using their own engineers to accomplish the projects.  (Id. at 2-82, 2-83).  Jed explained his job responsibilities in relation to various projects that he had been assigned.  (Def.'s Exh. 3, pp. 3-5).  Although he had indicated to Major in his prior phone conversation with her that he was "over" certain of these engineering projects, Jed explained in the April 12 memo that each of the projects he listed was completed by either outside contractors, OEM engineers, or other plant engineers.  Jed denied that he ever supervised any employees so as to be considered a supervisor.  (Def.'s Exh. 6, p. 4).  The "bottom line" according to Jed in his memo was that the company projects he was assigned were completed with his assistance, but the work itself actually was performed by the outside experts mentioned above.  (Def.'s Exh. 3, p. 5).  All that he did was "daily documentations, tabulations."  (Id. at 2-86).

Jed sent a third memo to Major dated April 20, 2005.  (Id. at 2-99, Def.'s Exh. 4, memo of 4/20/05).  In this April 20 memo, Jed denied that he was properly classified as a professional plant engineer and a professional environmental coordinator.  (Def's Exh. 4, p. 1).  He denied that he was in charge of, or "over" (1) plant facility maintenance, (2) a grit blast project to rebuild cyclone equipment, (3) a project to correct a torit grit blaster filter unit, or (4) a 400-ton press project.  Jed claimed that all these projects were supervised by contractors who had their own engineers and that he did not exercise any discretion on these projects.  (Id.).  He also denied in the same memo that he was "over" the wastewater treatment facility, the acid dip lines or paint lines.  (Id.).

Jed was questioned at trial concerning a private written communication he sent to Owensboro attorney Jenny Owen Miller on June 18, 2004 (DN 43, Tr. 07/18/2008, p. 2-156,

Def.'s Exh 7, letter of 06/18/04).  In his letter, Jed advised Miller that he was "considered to be an exempt salary person."  (Def's Exh. 7, p. 1).  He additionally asked Miller, "How many hours a week would be considered a fair number of hours that a salaried exempt person would have to give a company?"  (Id.).  Jed denied at trial, however, that he believed himself to be a salary exempt employee merely because he had used the term in his letter.  He explained that his communication to Miller involved only potential legal claims for harassment and abuse, rather than a claim for unpaid overtime.  (Id. at 2-159).  He had already communicated with the Kentucky DOL on his overtime case.  (Id.).  Accordingly, Jed did not contact Miller for any advice about his overtime claim.  Nevertheless, in the final paragraph of his letter to Miller, Jed admittedly asked her to "please let me know if I have any legal labor rights as an exempt salary person concerning the number of hours that I had to work...."  (Def.'s Exh. 7, p. 1).  Jed explained that he only used the term "exempt salary person" in his letter to Miller because the Kentucky DOL had told him that he was an exempt salary person.  (Id. at 2-160).

**c.    Jed's Projects.**

Brent Webster assigned Jed a number of special engineering projects during the time Brent worked at the Leitchfield plant, beginning in late 1997, through July 2002.  For example, Webster placed Jed in charge of the Texo Corporation coolant products after problems arose with keeping the coolant bath chemically stable at the Leitchfield plant.  After six months of conflict with Webster over changing the coolant product used, Jed gathered sufficient data to submit a report to management that successfully justified the change in coolant products.  (Id. at 2-131).  Apparently, the wrong coolant was being used and was causing operator health and

16

equipment rust problems.  (<u>Id</u>. at 2-132).  So, Jed got permission to contact Texo and have the supplier bring in a specialist to determine the nature of the problem.  (<u>Id</u>. at 2-132, 2-133).  When Brent Webster opposed the change in coolants, Jed went over his head to higher management to get the situation corrected.  (<u>Id</u>. at 2-133).

Later, in 2002-03, the Leitchfield plant was having a problem in the grit blast and polishing department with the air filtration system leaking grit, a fine particulate matter, into the plant air and out into the parking lot.  (<u>Id</u>. at 2-133). Jed was assigned to troubleshoot the problem.  Jed explained in an office memorandum dated Oct. 19, 2004, that the Torret filtration system was rebuilt by a maintenance supervisor and three of his employees using a service manual provided by the manufacturer.  (Def.'s Exh. 6, p. 9) (<u>Id</u>. at 2-136).  Jed himself did not rebuilt the filtration system.  (<u>Id</u>. at 2-135).  His role was to get the OEM specialist to come in and investigate the filtration system problems, which turned out to be the result of fire damage inflicted several months earlier.  (<u>Id</u>. at 2-136, 2-137).  Jed did not do manual labor at the Leitchfield plant himself.  (<u>Id</u>. at 2-140).

In early 2002, Jed was involved in troubleshooting another problem on the paint line known as the "orange peel" problem.  His involvement is summarized in a memorandum that he wrote to Brent Webster on January 10, 2002.  (<u>Id</u>. at 2-194, Def.'s Exh. 13, memo of 1/10/02).  In his memo, Jed related that he had been involved with "operators, supervisors, corporate personnel and outside paint and soap and chemical vendors to assist in our paint issue ..." (Def.'s Exh. 13).  The memo indicated that when Jed would be called to the manufacturing floor to troubleshoot the paint issue, he would spend the day watching saw blades going through the paint process in an attempt to determine the source of the orange peel problem.  (<u>Id</u>.).  After

17

several days using different blades and trial processes, Jed determined that the problem was caused by oil residue on the blades.

This oily residue remained on the blades because the blade washers, also known as the Clean-o-mat washers, were incapable of removing sufficient oil from the blade blanks for them to be processed properly. (<u>Id</u>. at 2). Jed's memo listed a series of short-term corrective actions that were implemented to reduce paint rejects, along with a long-term recommendation that the plant purchase two new Clean-o-mat washers to adequately clean the oil from the blade blanks. (Def.'s Exh. 13, p. 2). Jed explained in his trial testimony that as with other major problems, the orange peel problem itself actually was solved by the vendors, the chemical supply and paint supply people, who had the expertise to realize that a catalyst in the last tank of the process was causing the orange peel problem. (<u>Id</u>. at 2-198, 2-199).

In June of 2003, Jed helped troubleshoot issues involving the flatness of saw blade blanks coming off of a 400-ton blanking press. (<u>Id</u>. at 2-204, Def.'s Exh. 15, memo of 6/17/03). Apparently, blanks were coming off the press that were not flat. (<u>Id</u>.). After talking with the operators, Jed prepared the memo that contained their recommendations. (<u>Id</u>. at 2-207). According to Jed, the problem with the blanking press was identified by a set up employee on the manufacturing floor who knew that the wrong punch with an improper clearance was being used. This mis-sized punch caused the "diamond arbor issues" identified in the memo. (Def.'s Exh. 15, p. 1). Jed once again explained at trial that all he did was go to the press set up man, who told him what the problem was. (<u>Id</u>. at 2-208). There was no real troubleshooting involved according to Jed. (<u>Id</u>. at 2-209).

Jed prepared a number of internal memos on various equipment and other plant

18

problems he was involved in addressing.  Included among the memos Jed drafted were memos

on topics such as: (1) a suggestion to improve grit blast/polish efficiency (Def.'s Exh. 16); (2) a

memo containing a comparative cost analysis of paints supplied by two different paint suppliers

(Def.'s Exh. 27, memo of 1/18/2001); (3) a comparative performance analysis of an electrical

paint cure oven versus a gas cure oven (Def.'s Exh. 48, memo of 11/16/2000); (4) an analysis of

the potential cost savings through the purchase of a new soap tank central filtration system

(Def.'s Exh. 51, memo of 02/10/2001); (5) the potential improvements in efficiency through the

purchase of new Clean-o-mat washers (Def.'s Exh. 53, memo of 02/14/2001); (6) the procedures

for cleaning the carbide central cooling system (Def.'s Exh. 55, memo of 11/09/01); (7) a

followup on improvements in the carbide grind central cooling system and the acid dip and

Ransburg paint lines (Def.'s Exh. 57, memo dated 01/28/2002); (8) the potential cost savings

obtainable by substituting a new cleaner (DK-12500) for the Texo soap then in use (Def.'s Exh.

59, memo of 2/07/02); (9) an analysis of the problems in oil removal caused by the current clean-

o-mat cleaners (Def.'s Exh. 60, memo of 3/15/02); (10) blank flatness issues involving the 400-

ton press (Def.'s Exh. 68, memo of 6/18/03); and (11) shutdown projects for July 2003 (Def.'s

Exh. 70, shutdown project list).

Jed, as a member of the engineering department, was responsible to come up each

year with $50,000 in plant cost reductions.  (Id. at 2-141).  Much of this cost savings was met

through the increased efficiency resulting from the replacement of older equipment with new,

more efficient equipment.  (Id.).  Jed's cost savings record for 1999 showed a savings amount of

$420,419 (Id. at 2-178, Def.'s Exh. 9, 1999 cost savings).  Jed denied, however, that he

*personally* obtained these cost savings for the company.  Instead, he merely calculated the

19

$420,419 amount of savings achieved through the more efficient use of paint and chemicals.  (Id. at 2-178).  The cost savings themselves, according to Jed, were obtained by the expertise of the vendors that he contacted to help improve the efficiency at the plant.  (Id. at 2-179).

In Jed's view, just because his name was on the report didn't mean that he was solely responsible for the savings.  While the paint line was not his project to begin with, when it came time for the new equipment to be installed, he took charge of putting it in, so the cost savings were assigned to him.  (Id. at 2-142, 2-143).  Jed explained that, as to his role in the company after 1998, he was merely "a professional that [knew] ... people that could get the job done for us."  (Id. at 2-143).  Nevertheless, Jed considered himself to be above average when it came to troubleshooting, given his 30 years working at the plant.  (Id. at 2-143).  He had been involved with every piece of that equipment, all the materials, and knew the plant and the vendors.  (Id. ).

Asked by the Court to describe his role in problem solving at the plant, Jed explained that if a process or equipment problem arose on the manufacturing floor, he would go and talk directly to the equipment operators involved and to the equipment maintenance personnel to get an idea of the nature of the trouble.  (Id. at 2-187).  If the situation was bad enough that it could not be handled by plant personnel, he would go outside the plant to get a specialist ordinarily from the vendor that sold the malfunctioning equipment, or the chemical supplier, if the problem involved a chemical solution used in processing the saw blades.  (Id. at 2-188).  Jed denied, however, that he had the discretion and authority to analyze and choose among various alternative means to remedy the problem with a recommendation to company management.  (Id. at 2-189, 2-190).

20

Jed offered as an example the torrit filter problem, which was addressed by an engineer from the original equipment manufacturer who reworked the ductwork and redistributed the air through two different torrit filters using his unique engineering skills.  (Id. at 2-190).  As Jed viewed the matter, the vendor's engineer was really the person who solved the problem, but the entire plant benefitted as a result.  Jed merely made the call to get the vendor to send the engineer, took the estimate of the repair cost from the engineer, and submitted it to his supervisor for corporate approval.  (Id. at 2-191).  Nevertheless, Jed did agree that in such a situation he would make a recommendation, along with the recommendation of the vendor's engineer that would be considered by his supervisors.  (Id. at 2-192, 2-193).

### d.    Elvis Vaughn.

A number of Leitchfield plant employees and Bosch corporate employees testified at trial.  Elvis Vaughn, the Director of Human Resources and Associate Relations for Bosch, testified that in 1999, Jed's job responsibilities included the duties of plant engineer and environmental coordinator.  (Id. at 2-256).  According to Vaughn, Jed's job responsibilities remained unchanged from 1999 to 2004.  (Id.).  His employment status was salaried exempt based on his job description according to Vaugh.  (Id. at 2-257).  Because Jed was an exempt employee, Vaughn testified that he was not entitled to overtime pay during his final five years with Bosch.  (Id. at 2-258).

Vaughn explained that the prior environmental coordinator at the Leitchfield plant was Fran Lazausky.  (Id. at 2-259).  Further, Lazausky was classified as an exempt employee until he was demoted in 1999, and Jed was assigned the environmental portion of his duties.  (Id.

at 2-259).  The only time that Lazausky received any overtime prior to his demotion occurred on the few occasions that he filled in for a supervisor.  (Id. at 2-260).  Vaughn confirmed that another engineer, Jeff Cook, who worked at the company's Elizabethtown, Kentucky plant, was a salaried exempt employee who likewise occasionally received overtime when he filled in for a supervisor on seven or eight occasions.  (Id. at 2-260, 2-261).

According to Vaughn, the combined position of plant engineer/environmental coordinator existed at various Bosch plants including its plants at Toccoa, Georgia; Elizabethtown, Kentucky; Columbia, South Carolina; Greenville, North Carolina; West Memphis, Arkansas; and Heber Springs, Arkansas.  (Id. at 4-149, 4-150).  All of the employees who held this position at the plants were classified as exempt employees according to Vaughn. (Id. at 4-150).

Vaughn testified that during the 5-year statutory period after 1998, Bosch did not have any positions with the job title of "environmental coordinator."  No employees who held the combined position of plant engineer/environmental coordinator after 1999, were classified as nonexempt employees by Bosch.  (Id. at 4-150).  Vaughn, however, could not explain why the Vermont American job description for environmental coordinator (Pl's Exh. 3) listed the position as being a nonexempt one; although, he did note that the job description was not a Bosch job description.  (Id. at 4-148, 4-149).  (Id. at 4-152).  In his view, the designation of "nonexempt" at the top of the Vermont American job description for environmental coordinator was simply a mistake.  Given the duties, the job should be an exempt position.  (Id. at 4-153).

Vaughn added that Jed, as a plant engineer/environmental coordinator made nearly $60,000 a year, almost twice the $35,000 average salary earned by a union supervisor on

the manufacturing floor.  (Id. at 4-154).  Consequently, Vaughn explained that there was no salary pressure, as there was with supervisors, who were permitted to earn overtime pay so that their salaries would not ordinarily be exceeded by the union employees they supervised.  (Id. at 4-154).  As for the job description of "plant engineer/environmental coordinator" introduced as Plaintiffs' Exh. 1, Vaughn testified that this job description accurately represented the duties of the position for all plant engineer/environmental coordinators, with only some possible minor variations from plant to plant.  (Id. at 4-157).  Vaughn concluded his testimony by stating that Jed in his correspondence to Vaughn concerning the alleged harassment that Jed was enduring had indicated several times that he was an engineer, non-degreed but a better engineer than the degreed engineers that he worked with.  (Id. at 4-158, 4-159).

**e.     Rita Stevenson.**

Rita Stevenson, the Human Resource Manager at the Leitchfield plant, also testified.  (Id. at 2-264).  Stevenson confirmed that Jed worked as plant engineer/environmental coordinator at the Leitchfield plant from 1999, through 2004.  (Id. at 2-266).  According to her, Jed worked on special projects, wastewater treatment and with vendors.  (Id.).  He also supervised two water treatment employees, James Gary and Ernest Priddy.  (Id.).  Stevenson knew that Jed supervised them because he could give them job duties and had trained them.  (Id. at 2-266).  However, Jed did not have authority to fire either man, as both were union employees.  (Id. at 2-267).  In fact, Jed did not have the authority to hire or fire anyone at Bosch, according to Stevenson.  (Id. at 2-267).

Stevenson also knew Fran Lazausky, who held several job positions at the

23

Leitchfield plant.  (Id. at 2-268).  She recalled that Lazausky was an hourly employee who worked in environmental, health and safety inspection until he was demoted and went back to the manufacturing floor.  (Id. at 2-268).  His environmental job duties were combined with those of another job, the job of plant engineer and taken over by Jed Johnson.  (Id. at 2-268).  According to Stevenson, prior to the time that Lazausky returned to the plant floor, he was an inspector and therefore a nonexempt employee entitled to overtime.  (Id. at 2-269).  In contrast, Stevenson testified that Jeff Cook was an environmental person at the Elizabethtown plant who was classified as an exempt employee.  (Id. at 2-269).

Stevenson testified that Jed had complained to her on several occasions during the final five years of his employment about the number of hours he was working.  (Id. at 2-271).  Stevenson did not recall that Jed specifically mentioned overtime or having to work through his lunch and break periods when he did complaint.  (Id. at 2-271).  Stevenson specifically recalled receiving a memo from Jed in which he complained about the number of weekly hours he was forced to work.  (Id. at 2-273).  She forwarded this memo to Elvis Vaughn.  (Id.).  As she recalled Jed's complaints, he wanted to work fewer hours (Id. at 2-279).  Stevenson testified that nonexempt union employees at the plant, were required to request permission from their supervisor to work overtime before they could do so.  (Id. at 2-279).  Such employees were required to clock in and clock out.  Their time records were reviewed on a bi-weekly basis.  (Id. at 2-279).

Stevenson agreed that Jed did not have to abide by these types of timekeeping requirements.  (Id. at 2-280).  Stevenson could not recall ever seeing any request for overtime or time sheets submitted by Jed.  (Id. at 2-280).  She did recall occasionally seeing him leave the

24

plant during the work day on a weekly basis.  (Id. at 2-281, 2-282).  Because Jed was considered

to be a salaried exempt employee, plant Human Resources had no concern about him leaving

during the work day and did not "keep tabs" on him.  (Id. at 2-282).  Further, when Jed ceased to

be new product design engineer and became the plant engineer/environmental coordinator, he

received no reduction in salary nor any reduction in his benefits or bonus opportunities.  (Id. at

2-283).  According to Stevenson, "It was just a different position."  (Id.).

**f.      David Goodling.**

David Goodling testified that he began work for Vermont American in 1998.  He

became the plant manager of the Leitchfield plant in 1999.  (Id. at 2-2895).  Later, he was

promoted to Director of Manufacturing and to Vice-President of Manufacturing in 2003.[4]  (Id. at

2-286).  After becoming Director of Manufacturing, Goodling was responsible not only for the

Leitchfield plant, but also the company's plants in Elizabethtown and Toccoa, Georgia.  (Id. at 2-

286).  When he became vice-president in 2006, Goodling became responsible for all of the

Bosch facilities in the United States.  (Id.).

Goodling first met Jed in 1998, when he began to work as plant manager in

Leitchfield.  (Id. at 2-287).  Goodling described Jed's duties at that time as being cost reduction,

project management and "driving efficiency in the plant ..."  (Id. at 2-287).  According to

Goodling, Jed later assumed the additional duties of the environmental coordinator in addition to

---

[4]  When Goodling became Director of Manufacturing, Tim Hess took over as plant
manager in 1999.  (Id. at 3-49).  Hess remained plant manager for approximately a year, while
Goodling remained at the plant until his move to Louisville.  (Id. at 3-49).  Hess was then
replaced by Mac Carson as plant manager.  (Id. at 3-50).  Two years later, Gary Skaggs became
acting plant manager in 2002, and remained so until the plant closed in 2004.  (Id. at 3-51).

his engineering work.  (Id. at 2-287).  By 2001, however, Goodling had moved to Louisville and was less involved with activities at the Leitchfield plant.  (Id. at 2-288).

Goodling agreed that Jed had no authority to hire or fire plant employees.  (Id. at 2-289).  At most, he could make recommendations to the Human Resources department.  (Id.). Goodling could not recall Jed complaining about having to work long hours or overtime.  (Id. at 2-289).  Although Goodling was aware that Jed was responsible, as part of his project work, to direct various groups of employees at the plant, he could not answer whether Jed actually supervised any employees.  (Id. at 2-291).  Goodling estimated that Jed spent approximately 50% of his time on these special projects.  (Id. at 2-292).  Goodling did recall that Jed was put in charge of a project that consolidated the Ransburg paint line from Plant 2 into Plant 1.  (Id. at 2-292, 2-293).

Goodling explained that a significant portion of Jed's job responsibility as an engineer included cost reduction at the plant.  (Id. at 2-294).  Goodling recalled that Jed was instrumental in changing from one paint supplier to another, a change that generated significant savings.  Jed also got approval to upgrade one of the paint drying ovens, which resulted in the company being able to process more blades.  (Id. at 2-294).  These two changes resulted in "very significant savings" according to Goodling.  (Id.).  Goodling also recalled another cost savings project that involved silkscreen rags that Jed handled.  (Id. at 2-295).  Jed also was responsible for a carbide sludge recapture project that allowed the plant to sell the recaptured sludge resulting in $10,060 recaptured annually.  (Id. at 3-12).  Likewise, Jed's project, the Wabash new paint project mentioned above, resulted in a 20% increase in efficiency that reduced the cost per gallon of paint from $58 to $45.  (Id. at 3-13).  According to Goodling, Jed was the "point of

26

contact" for troubleshooting the paint line at the plant, an ongoing project to retain efficiency. (Id. at 2-295).

Goodling testified that cost reduction responsibilities were a very important goal, and each person in the management team at the plant had a certain annual dollar amount of cost reductions to achieve each year.  (DN 44, Tr. 07/18/2008, p. 3-5).  Such cost reductions were necessary to stay competitive with foreign competition.  (Id).  Performance bonuses awarded to eligible employees were based on achieving cost reduction goals.  (Id. at 3-5).  Jed was one of the individuals eligible for the bonus program.  (Id.). As Goodling described Jed's role in cost reduction, as an engineer, Jed would communicate with various individuals and use his "skill set" to determine the best means of reducing costs either through changes in material, methods or manpower.  (Id. at 3-6).  All engineers at the plant had the same type of cost reduction goals. (Id. at 307).

Goodling testified that Jed was the highest paid engineer working at the Leitchfield plant.  (Id. at 3-17).  As part of his job responsibilities, Jed had the authority to request capital expenditures to purchase new equipment.  (Id. at 3-21, 3-22).  Such capital expenditure projects, according to Goodling, were self-directed.  They could not be performed simply by following an standard operations manual.  (Id. at 3-22).  As for the manufacturing processes, Goodling explained that typically all of the troubleshooting for any particular process would be done by the engineer assigned to that process area so that if a problem developed with the paint line, Jed would be responsible for troubleshooting that particular problem.  (Id. at 3-24).  Goodling estimated that 90% of the time such troubleshooting was performed by employees at the plant, like Jed, who was responsible for the grit blast process and for the water filtration

27

process, as well.  (Id. at 3-25).  Goodling recalled a problem with soap residue on the blades that Jed was able to troubleshoot and correct.  (Id. at 3-27).

Goodling also testified that he did see Jed leaving the Leitchfield plant several times a week during the workday.  (Id. at 3-31, 3-32).  He could see Jed in the parking lot from his office, which was located at the front of the plant.  (Id.).  Goodling considered Jed to be part of the management team, or the salaried group, within the plant.  (Id. at 3-33).  He would have regular staff meetings with all salaried employees which Jed Johnston attended.  (Id. at 3-33).

Goodling conceded that Jed was not a chemist.  (Id. at 3-40).  Nevertheless, Goodling explained that due to his many years of experience working at the plant, Jed probably was one of the most knowledgeable individuals in the paint area.  (Id. at 3-41).  In fact, Goodling witnessed Jed's problem solving skills on a day-to-day basis.  In his words, "Whenever we had a problem, we would call Jed and [sic] help with the troubleshooting."  (Id. at 3-41).

Goodling also conceded that, within the management salaried group of employees, the plant had both exempt and nonexempt employees depending upon the individual employee's job classification.  (Id. at 3-47).  Jed, according to Goodling, was classified as an engineer.  All engineers at the plant were considered to be exempt employees.  (Id.).  This understanding, according to Goodling, was based on the job duties, functions, pay scale and eligibility for bonus that came with the position.  (Id. at 3-47).

**g.      Steve Lawson.**

Steve Lawson began working for Vermont American in April of 2000, as Human Resources Manager at the Leitchfield plant.  (Id. at 3-54).  In July of 2002, he was transferred to

the Louisville office.  (Id. at 3-54).  Following his move to Louisville, Lawson became responsible for the company plants in Elizabethtown and Leitchfield, Kentucky, Taccoa, Georgia and Lincoln and Hickory, North Carolina.  (Id. at 3-55).

Lawson testified that when he began working at the Leitchfield plant in 2000, Jed's responsibilities included an engineering function and an environmental function.  (Id. at 6 3-55, 3-56).  Jed's job duties involved managing the seven manufacturing processes and his environmental responsibilities.  (Id. at 3-56).  He also had a leadership role on various special projects.  (Id. at 3-56).  Lawson recalled that there was quite a bit of disagreement between Jed and his immediate supervisor in the engineering department, Brent Webster, with the communication between the two men being "very poor."  (Id. at 3-59).  One of the responsibilities of the engineering department was "driving costs, driving improvements to make sure that our facility was competitive."  (Id. at 3-59).

Lawson emphasized that at the time he began work with the company, Jed's job was classified as an exempt position.  (Id. at 3-69, 3-75).  Lawson explained that Jed's position as plant engineer/environmental coordinator had both engineering and environmental duties. The environmental duties included individual and creative thinking to reduce waste, reduce landfill usage and reduce costs.  (Id. at 3-69).  Lawson recalled that Jed did complain to him about working long hours; however, Jed did not complain to him about how much he was being paid.  (Id. at 3-75)  (Id. at 3-70).  Jed was not the supervisor for James Gary or Ernie Priddy, but he did assign them work.  (Id. at 3-71).  Their actual supervisor was an employee named Curtis Whitehead.  (Id. at 3-71).  It was Lawson's understanding that Jed was classified by the company as being an exempt employee.  (Id. at 3-75).

29

Although Lawson acknowledged that he did not observe Jed's work on a day-to-day basis, he did see Jed proposing improvements and resolving problems at the plant that the technical people could not resolve.  (Id. at 3-76).  For example, Lawson observed Jed running the project to close plant no 2.  Jed coordinated the contractors and made decisions on what needed to be done to properly shut down.  (Id. at 3-76).  Very often, according to Lawson, Jed was successful at resolving problems.  (Id.).  Lawson also had observed Jed working with plant employees James Gary and Ernie Priddy.  (Id. at 3-76, 3-77).  Jed established the standards and work procedures for the two men, would work with them and provide them with solutions in handling environmental issues.  (Id. at 3-77).

g.      **Cross-examination of Jed Johnston.**

Jed explained his specific involvement in the cost savings resulting from the recycling of carbide sludge sales.  (Def.'s Exh. 30).  Although his name did appear on the chart detailing total cost savings, Jed explained that carbide sludge recycling actually began in 1997, *before* he ever took over as plant engineer/environmental coordinator.  (Id. at 3-108).  His only role concerning the cost savings from sludge recycling was simply to calculate the annual savings obtained.  (Id.).  Thus, while his annual bonus was computed based on this cost savings, the savings from any particular project continued year after year, so that a project completed years earlier might show ongoing cost savings, even though Jed possibly had little or nothing to do with the original project that resulted in the savings.  (Id. at 3-109).  Nevertheless, Jed conceded that the amounts identified on his carbide sludge recycling chart were used to calculate his bonus.  (Id. at 3-111).  Jed also agreed that part of the job duties of an environmental

30

coordinator is to recycle carbide sludge.  (Id.).

As part of his duties as environmental coordinator, Jed produced a number of environmental quarterly updates (Def.'s Exh. 40, 41) that reflected various cost avoidance or reduction obtained.  Part of his duties as environmental coordinator also included training employees about hazardous materials.  (Id. at 3-148). These duties ordinarily involved showing a standard film and discussing its contents.  (Id. at 3-148, 3-149).  Essentially he showed the same training film to the same people year after year.  (Id. at 3-149).

Jed agreed that one of his responsibilities was to reduce the costs incurred in the disposal of hazardous and nonhazardous waste at the plant.  (Id. at 3-151).  Jed identified a number of different environmental cost reductions that he was either directly or indirectly involved in producing.  (Id. at3-152, 3-153 to 3-155) (Def.'s Exh. 43).  As far as performing the duties of an environmental coordinator, Jed explained that he had no formal background in environmental responsibilities and that he had to be trained to take over Fran Lazausky's job, even though he was generally familiar with the manufacturing processes because he had "been around manufacturing" at the plant.  (Id. at 3-160, 3-161).  Included in the list of Jed's environmental responsibilities as determined by Brent Webster was to ensure that all environmental reports and procedures were completed accurately and on time and that the plant receive no environmental citations or was out of compliance with environmental regulations. (Def.'s Exh. 45, p. 2) (Id. at 3-162).

Jed provided his supervisor Brent Webster and the plant manager David Goodling with a memo in August of 2000, that identified several of his ideas for production cost savings. (Def.'s Exh. 46).  One of these ideas was to eliminate the wash of blades after carbide grinding

31

with an estimated savings of $30,000 per year.  (Id. at 3-165).  His memo also addressed the potential cost savings of switching paint vendors from Tioga to Wabash for gold and silver metallic paint at an estimated cost savings of $27,126 per year.  (Id; Def's Exh. 46, p. 1).  Jed calculated the annual potential savings from switching paints and advised Brent Webster of potential problems with variable quality on one of the paint test runs.  (Id. at 3-169, 3-170) (Def.'s Exh. 47).

In response to the Court's questioning, Jed conceded that he was in charge of this paint project and that all of the technical information that he requested was coming to him.  (Id. at 3-178, 3-179).  Although he was in charge of the paint project, Jed explained however that the ultimate decision on whether to go with the Wabash paints was made at the corporate level.  (Id. at 3-180).  In his view, all he did was simply convey information between various departments at the plant such as plant engineering, quality control and corporate engineering in Louisville. (Id.).  Jed conceded, however, that it was his job to put together all of the technical information that was gathered from the various departments concerning the paint comparison testing.  (Id. at 3-181).  He also conceded he could recommend to the plant general manager that the proposed paint change be made, if he liked the results obtained in terms of number of saw blades painted per gallon of paint and resulting savings.  (Id. at 3-181, 3-182).  Still, the ultimate decision on whether to make the change rested with corporate headquarters in Louisville.  (Id. at 3-182).

Jed also testified about a visit that he and a vendor chemist made to another company, AK Steel, to review a filtration system, the "Hyde ultra filtration system."  Jed went to observe the filtration unit in operation to see if it was economically beneficial to switch the soap tank central filtration system at the plant.  (Id. at 3-188, 3-189) (Def.'s Exh. 51).  After viewing

32

the Hyde ultra filtration system, meeting the system operator and maintenance personnel at A.K.

Steel, he concluded that it would be beneficial for the Leitchfield plant to purchase the filtration

system.  (Id. at 3-189).  Jed recommended the company purchase of the system, but like his

recommendation to purchase the Clean-o-mat washers, his recommendation was not approved

despite his calculation of an anticipated annual savings of $26,919 that would result in a return

on investment in 2.2 years.  (Id. at 190) (Def.'s Exh. 51, 52).

Jed acknowledged that one of his environmental coordinator responsibilities was

to monitor the central coolant system at the plant.  In 2001, he handled the cleaning schedule and

assigned approximately a dozen equipment operators to clean out the coolant lines and trenches

along with the coolant filtration tank system at the plant.  (Def.'s Exh. 55).  The employees

assigned to the job were nonexempt union members who were entitled to receive overtime.  (Id.

at 3-201, 3-202).  Jed explained, however, that the entire process for cleaning the central coolant

system was standardized and that all he did basically was change the names of the employees

identified on the form memo used for the assignment.  (Id. at 3-203).  He personally did not

approve any overtime for the employees involved.  (Id.).  Jed attended environmental health and

safety training at a conference off-site in Cincinnati in 2002.  (Id. at 3-225).  On that occasion,

the company paid for his lodging.  He carried a company credit card which he seldom used.  (Id.

at 3-226).


**h.      Gary Skaggs.**

Gary Skaggs testified next.  Skaggs started with the company in Leitchfield in

1986, as a machinery operator.  (Id. at 3-256).  In the early 1990s, he became a supervisor on

33

third shift.  (Id.).  In 2001, he became lead supervisor/operation manager at the plant.  (Id. at 3-257).  His final position prior to shutdown was acting plant manager after Mac Carson left.

Skaggs testified that during his time at the plant he had occasion to work with Jed. Jed was then responsible for the coolant system and all of the soap tanks and paint line in building 2, where he monitored the coolant system and regulated the soap and rust inhibitor tanks on the paint line.  (Id. at 3-258).  Skaggs recalled that after he moved to building 1 of the plant, he requested Jed to troubleshoot paint issues that involved scratches on the saw blades. (Id. at 3-258).  That happened around 2002, prior to when Skaggs became plant manager.  (Id. at 3-259).  Paint line problems were an ongoing issue at the plant.

Skaggs recalled a project at the plant when building 2 switched coolants from Texo to Castro.  (Id. at 3-260).  According to Skaggs, that was one of the projects that Jed handled.  Skaggs estimated that it took Jed about two or three weeks to complete the coolant evaluation.  (Id. at 3-260).  Skaggs considered it to be a "major project" because it affected plant operations in many different ways.  (Id.).

Skaggs observed Jed working on issues in the acid dip line in building 1.  He recalled that occasionally there would be problems with the paint not adhering to the blades.  (Id. at 3-261).  Skaggs agreed that he also had seen Jed directing the work of Ernie Priddy and James Gary in building 2.  If James or Ernie had a problem, Skaggs testified that Jed would help them troubleshoot it.  (Id. at 3-262, 3-263).  Skaggs estimated that Jed helped James Gary with troubleshooting issues maybe once every several weeks or once a month.  (Id. at 3-263).

Skaggs also had observed Jed working in the blast and polish department at the plant to make sure that all the dust residue was properly removed and that there were no leaks in

34

the venting system.  (Id. at 3-265).  According to Skaggs, with Jed's acquired knowledge from making saw blades as long as he did, he knew a lot about the grit blast guns.  (Id. at 3-265). Skaggs confirmed that Jed helped resolve the grit blast residue that was escaping out of the ventilation into the parking lot.  Jed also helped resolve the parking lot problem with ice accumulation by overseeing the installation of some curtain drains to prevent water from freezing over in the lot.  (Id. at 3-267).

After Skaggs, became plant manager, Jed's duties did not change except that Jed reported directly to him.  (Id. at 3-268, 3-269).  Jed's environmental job responsibilities, as Skaggs understood them, included taking care of all the waste at the plant and ensuring compliance with federal, state and local certification requirements.

Skaggs recalled that Jed participated in what were known as "rework meetings," Department representatives, engineers and management, would get together at these meeting to work on eliminating the number of saw blades that failed to meet quality standards on the production line.  (Id. at 3-275, 3-276).  Jed not only attended these meetings, he also offered suggestions to fix problems and reduce costs, according to Skaggs.  (Id. at 3-276).  As far as the final plant closing at Leitchfield in 2004, Jed's role was to ensure that the plant and equipment were properly cleaned up and shipped out in accordance to EPA standards.  (Id. at 3-276, 3-277).

## LEGAL ANALYSIS

Kentucky statutory wage and hour law is found in Chapter 337 of the Kentucky Revised Statutes (KRS).  Specifically, KRS 337.285 (West 2007) creates a statutory right that entitles an employee in Kentucky to be paid at a rate of one and one-half times his or her regular

35

hourly wage rate for hours of work performed in excess of 40 hours per week.  See KRS

337.285(1) (West 2007).  The statute is written in prohibitive terms:

> (1) No employer shall employ any of his employees for a work
> week longer than forty (40) hours, unless such employee received
> compensation for his employment in excess of forty (40) hours in a
> work week at a rate of not less than one and one-half (1-1/2) times
> the hourly wage rate at which he is employed.

Id.  This language is put into effect through the administrative regulations of the Kentucky

Department of Labor (DOL).  See 803 KAR 1:060 (May 2008) ("[An employee] may work as

many hours a week as he and his employer see fit, so long as the required overtime

compensation is paid him for hours worked in excess of forty (40) hours as prescribed in KRS

337.285.").

Critical to an understanding of the scope of the protection afforded by both the

statute and regulation is the definition of the term "employee."  The definition of the term is

contained in a separate statute, KRS 337.010(2) (West 2007).  This related wage and hour statute

provides that as used in KRS 337.285,

> (a) "Employee" is any person employed by or suffered or
> permitted to work for an employer, but shall not include:
> ....
> 2.  Any individual employed in a bona fide executive,
> administrative, supervisory, or professional capacity, or in the
> capacity of outside salesmen, or as an outside collector as the
> terms are defined by administrative regulations of the executive
> director....

KRS 337.010(2)(a) 2 (West 2007).  These exceptions for administrative, supervisory or

professional employees are explained in the extended regulation found at 803 KAR 1:070 (May

2008) ("The exemptions set forth in KRS 337.010(2)(a)2 [are] ... defined by this administrative

regulation....").

36

Much of the debate in this action centers on whether Jed meets the definition of an "employee" under KRS 337.285.  To be entitled to claim overtime compensation under Kentucky's wage and hour laws, Jed must proved he is an "employee" and not a bona fide administrator, supervisor or professional.  Jed's position in a nutshell is that his duties during the final five years of his employment, as he actually performed them, were routine and repetitive in nature.  For the most part, Jed denies that he had any significant discretion or that he exercised any independent judgment.  None of his duties, after he was no longer a new product design engineer, required Jed to exercise imagination, originality, invention or creative talent in his view.  As Jed puts the matter, he basically became a "tabulator" an employee who documented various manufacturing processes and chemicals used therein.  Accordingly, Jed insists that he does not fall within any of the statutory exemptions for professional, administrative or supervisory personnel, who both parties agree work outside the protection of Kentucky's wage and hour laws insofar as the overtime protections of KRS 337.285(1) (West 2007) are concerned.

Bosch takes a dramatically different view.  According to Bosch, Jed's job duties, as both described and performed, easily meet the regulatory requirements for all three exemptions mentioned above.  Bosch maintains that the strongest proof that Jed worked as an exempt employee during his final years of employment with Bosch, comes from Jed's *own* documents.  These documents, along with the testimony obtained at trial, repeatedly demonstrate in Bosch's view that Jed was a professional engineer, as confirmed by not only his title and compensation level, but also by his key involvement in such traditional engineering functions as: (1) troubleshooting significant manufacturing problems in various phases of the production process; (2) achieving significant cost reductions by analyzing the efficiency of both the

37

manufacturing processes and waste handling procedures that resulted in hundreds of thousands of dollars in savings; and (3) routinely advising management on matters of plant-wide significance, such as the potential purchase of new manufacturing equipment like the Hyde filtration system and Clean-o-mat washers.

Beyond these traditional professional engineering duties, Bosch points out that in his role as plant engineer/environmental coordinator, Jed also was responsible for servicing the company's environmental compliance needs at the federal, state and local levels by monitoring the handling and disposal of hazardous and nonhazardous waste to ensure regulatory compliance while thoroughly documenting such compliance in major projects such as the closure of Leitchfield plant 2.  Finally, Bosch insists that Jed's job responsibilities also satisfied the supervisory exception given his assignment of duties to, and control over, employees James Gary and Ernie Priddy, who assisted Jed with his environmental duties at Jed's discretion.  For these reasons, Bosch maintains that Jed has failed to make his *prima facie* case that he is an "employee" for the purpose of Kentucky's statutory overtime protection, a burden that unlike federal law arising under the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1) (FLSA), rests squarely on Jed if he has any hope to recover.


**a.      Burden of Proof.**

Kentucky's wage and hour laws, while analogous to the federal ones arising under the FLSA, are significantly different in this one major respect.  Unlike federal law, the burden of proof is on the employee to show that he is not exempt from the definition of "employee" under the Kentucky statute.  The recent decision of the Kentucky Supreme Court in

38

City of Louisville, Division of Fire v. Fire Service Managers Assoc., 212 S.W.3d 89, 94-95 (Ky.

2006) directly addresses the burden of proof issue in an overtime case arising under KRS

337.285(1) (West 2007).  To quote the court:

> When a party initiates a claim before the Cabinet for entitlement to
> overtime pay under KRS 337.285, proof that a claimant is an
> 'employee' pursuant to that statute is part of his or her *prima facie*
> case.  Thus, the negative of that issue, that a claimant is *not* an
> 'employee,' is not, as the FSMA argues, an affirmative defense for
> which the City bears the burden of proof.

Id. at 94 (original emphasis) (case citations omitted).

The court explained its holding by distinguishing the statutory structure of

Kentucky wage and hour law from that of the FLSA, which under 29 U.S.C. § 207(a)(1)

automatically includes all employees within the protection of the federal overtime statute, unless

a specific exemption such as the administrative or professional exemption arising under 29

U.S.C. § 213(a)(1) applies.  Kentucky's statutes, in contrast, exclude from the very definition of

the term "employee" those individuals who work in a bona fide administrative, professional or

supervisory capacity that satisfies the requirements of the DOL regulation at 803 KAR 1:070

(May 2008).  As explained in City of Louisville, Division of Fire, 212 S.W.3d at 95, "Individuals

who are employed in a bona fide supervisory capacity are not 'employees' at all under KRS

337.285, and thus are completely excluded from the statute's scope."  Id.  Thus, the "distinct

structural difference between the FLSA and KRS 337.285 renders the federal case law cited by

the Court of Appeals inapposite."  Id.

Indeed, not only did the Kentucky Supreme Court in City of Louisville, Division

of Fire place the burden of proof squarely on the overtime claimant to prove his or her employee

status by showing that none of the exemptions apply, the court then continued its distinction of

the federal statutes to reject the oft-stated principle arising under the FLSA that such exemptions are to be "narrowly construed against the employer."  See Martin v. Indiana Michigan Power Co., 381 F.3d 574, 578 (6ᵗʰ Cir. 2004) ("The exemptions to the FLSA's overtime provisions are 'to be narrowly construed against the employer seeking to assert [them]'") (citing Douglas v. Argo-Tech Corp., 113 F.3d at 70 (quoting Arnold, 361 U.S. at 392)).  Once again, to quote the Kentucky Supreme Court,

> Likewise, federal cases relied on by the FLSA that require an 'exemption' to be narrowly construed against the employer are similarly inapplicable here, since the drafting of KRS 337.010(2)(a) to exclude bona fide supervisory employees from its scope does not constitute an exemption.

City of Louisville, Division of Fire, 212 S.W.3d at 95 (citing Arnold, 361 U.S. at 392; Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295-96 (1959)).

The end result of this unique approach to Kentucky wage and hour laws is that Jed Johnson is put at a double disadvantage in his efforts to recover the unpaid overtime allegedly due to him.  Not only must Jed carry the burden of proof to persuade the Court that he is a statutory "employee" for the purpose of KRS 337.285(1) (West 2007), by showing that he does *not* fall within one of the categories of administrative, supervisory or professional persons outside the definition of employee; he must also face this burden without the benefit of the presumption, now limited to federal labor law, that such exemptions are to be narrowly construed in the favor of the plaintiff employee.

The result is that Kentucky plaintiffs such as Jed find themselves in a distinctly different position in their efforts to recover unpaid overtime than their federal plaintiff counterparts who are proceeding under the provisions of the FLSA.  This is not to say that all

federal FLSA case law is unhelpful, or should be overlooked.  To the contrary, the federal regulations that define the exemptions for bona fide administrative, supervisory and professional employees are extremely similar in their language to the Kentucky regulations concerning such individuals found in 803 KAR 1:070 (May 2008). The material difference is who must make the required showing that the elements of any particular exemption do, or do not, apply to a specific employee given his or her duties.  <u>Stathers v. Ice Cream Distributors of Evansville, LLC</u>, Civil Action No. 3:06CV-526S, 2007 WL 3342498 at *2 (W.D. Ky. Nov. 9, 2007) (citing <u>City of Louisville, Div. of Fire</u>, 212 S.W.3d at 94 for the proposition that a showing that a claimant is an "employee" under KRS 337.285 is an element of the claim itself).

**b.      Duties of the Employee.**

The ultimate duty of the Court, as explained above, is to determine whether Jed has persuaded the Court that he is a protected employee within the statutory definition of KRS 337.010(2)(a)2 (West 2007) as the statute is interpreted under the aforementioned state regulations that detail overtime pay requirements and the elements that determine those individuals employed in a bona fide administrative, supervisory or professional capacity.  See 803 KAR 1:070, §§ 3, 4 and 5 (May 2008).  Before the Court can determine whether Jed's duties as plant engineer/environmental coordinator rendered him a protected, or nonexempt, employee under KRS 337.285(1) (West 2007), the Court first must explain briefly those factors that are important, and those less so, in evaluating Jed's job duties to determine if he has carried his burden of proof.

The parties battled at length throughout the trial and in their post-trial briefs over

the true nature of Jed's duties at the Leitchfield plant from 1999, until his disability retirement in

2004.  Much dispute centered on the terms of the Vermont American job description for the

position of plant engineer/environmental coordinator (DN 42, Pl's Exh. 1).  In fact, the parties

went point by point through the job responsibilities identified on this job description in their

efforts to prove or disprove Jed's status as a nonexempt or exempt employee.  Likewise, the

parties also turned to Jed's own office memoranda, his communications with the Kentucky DOL,

and even his correspondence with an attorney to debate whether Jed's use of specific terms in

relation to his responsibilities or employment status established the nonexempt or exempt nature

of his employment.  For example, the question arose whether Jed's use of the term "over" to

describe his role in relationship to specific engineering projects indicated that he was in charge

of such projects.  The debate also involved whether his reference to himself as being a "salary

exempt employee" in a letter to a potential attorney indicated a concession of his employment

status.

   Such arguments, while not entirely irrelevant, are not the proper focus of the

Court when determining whether Jed's duties place him within or outside of the overtime

protection afforded by KRS 337.285(1) (West 2007).  The law is well established in the federal

courts that neither the plaintiff employee's nor the defendant employer's description of the

plaintiff's employment position or authority is controlling.  Thomas v. Speedway SuperAmerica,

LLC, 506 F.3d 496, 503-04 (6th Cir. 2007) ("We stress that courts cannot rely upon the plaintiff's

or the employer's description of the plaintiff's position or authority; instead we must 'look at the

plaintiff's actual duties' to determine whether she qualifies for the executive exemption.") (citing

Ale v. Tenn. Valley Authority, 269 F.3d 680, 692 (6th Cir. 2001)).  Likewise, the use of words

such as "in charge" or "over" is not some form of magical incantation that will automatically render a plaintiff exempt from protection.  Ale, 269 F.3d at 691.

The focus more properly falls upon "evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions and performance evaluations.  Schaefer, 358 F.3d at 400 (citing Ale, 269 F.3d at 688).  A plaintiff seeking recovery of unpaid overtime therefore is not precluded from arguing that his or her day-to-day activities differed from those described in his or her job description, resume or other documents.  Id. ("We have recognized that 'resumes may not provide the most accurate picture of an employee's job because resumes are typically designed to enhance the employee's duties and responsibilities in order to obtain a job.'") (citing Ale, 269 F.3d at 689 n. 2).  Consequently, it is Jed's duties as actually performed at the plant from 1999, until his departure in 2004, that are the principal focus, rather than anyone's description of such duties.

**d.    Elements of Proof.**

The next matter to be addressed after the burden of proof involves the elements of proof required to establish that Jed is a protected "employee" within KRS 337.010(2) (West 2007).  If Jed shows by a preponderance of the evidence that he can satisfy the statutory definition of employee, he will be entitled to overtime under KRS 337.285(1) (West 2007).  Because the statutory definition of "employee" excludes individuals who are bona fide executive, administrative, supervisory or professional employees, Jed has the burden under City of Louisville, Div. of Fire, to show that his job duties as they existed at the Leitchfield plant

43

from 1999 to 2004, did not meet the criteria set forth in 803 KAR 1:070 (May 2008) that define the excluded exemptions for executive, administrative, supervisory or professional employees.

The Court must look closely at the terms of 803 KAR 1:070 (May 2008), along with any analogous federal regulations, in order to understand the elements, both common and unique, that apply to the above-listed exempt categories of workers.  If Jed can persuade the Court that at least one essential element of each category of exempt employee does *not* apply to him, he will establish his employment status as a statutory "employee" entitled to the protection of Kentucky's overtime statute.  Then, and only then, will the Court turn to the question of whether any unpaid overtime is due him, and if so, how any such arrearage would be properly calculated under applicable state regulations.

Examination of 803 KAR 1:070 (May 2008) and related federal case law makes one point immediately clear.  The exclusion from the overtime provisions of KRS 337.285(1) (West 2007) imposed on individuals who are bona fide executive, administrative, supervisory or professional employees is not intended in any respect to apply to traditional "blue collar" workers or manual laborers that do routine, repetitive work with their hands, or work that requires physical skill.  The very first section of 803 KAR 1:070 expressly cautions that such individuals are not intended to fall within the exclusion for administrative, supervisory or professional employees.  To quote the regulation,

> The exemptions set forth in KRS 337.010(2)(a)2 as defined by this administrative regulation, do not apply to manual laborers or to other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy.  These nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction

> required for exempt learned professionals such as medical doctors,
> architects, and archaeologists.  Thus, for example, non-
> management production line employees and non-management
> employees in maintenance, construction, and similar occupations
> ... are entitled to minimum wage and overtime pay under KRS
> Chapter 337 and are not exempt under this administrative
> regulation no matter how highly paid they are.

803 KAR 1:070 § 1 (May 2008).

This same underlying policy is found in the case law that interprets the FLSA.

See Darveau v. Detecon, Inc., 515 F.3d 334, 338 (4th Cir. 2008) ("Although salary alone is not

dispositive under the FLSA, we note that the FLSA was meant to protect low paid rank and file

employees....") (citing Counts v. S.C. Elec. and Gas Co., 317 F.3d 453, 456 (4th Cir. 2003));

Evans v. Continental Motors Corp., 105 F. Supp. 784, 793 (E.D. Mich. 1952) ("The purpose of

the Fair Labor Standards Act in relation to overtime pay for nonexempt employees is to grant

right to overtime pay to that class of employees who come within commonly understood

designation of workers as distinguished from manager, superintendents, foremen or bosses.").

See also, Mafizola v. Hardy-Burlingham Mining Co., 207 S.W.2d 769, 771 (Ky. 1947)

(Overtime claimant who surrendered his union card, and was not covered by the union contract

during the 20-month period he worked as a section foreman without making any claim to

overtime, or protesting his receipt of straight pay, was not a nonexempt employee entitled to

overtime).

The above section of 803 KRS 1:070 (May 2008) readily establishes the core

group of workers that the wage and hour provision of KRS Chapter 337 are intended to protect.

Manual laborers and other "blue collar" workers engaged in the performance of routine,

repetitive physical labor are the chief constituency of KRS 337.285(1) (West 2007).  A clear

45

example of such a group would be the union production employees at the Leitchfield plant, who were paid on an hourly basis and were required to keep time records.  Jed was not a member of this group.

The preceding paragraph should not be misread to suggest, however, that only union employees, or even nonunion manual laborers, are protected by Kentucky's minimum wage and overtime laws.  Nonunion employees who can show that they are not excluded from the statutory definition of "employee" under KRS 337.010(2)(a)2 are equally entitled to the overtime protection of KRS 337.285(1).  For such individuals, their task in establishing their entitlement to the protection of KRS 337.285(1) (West 2007) may be a more difficult road to travel than that faced by low wage, hourly union employees.

One non-issue must be briefly dismissed before the Court may begin its analysis of the unique elements of each exemption.  The exemptions that apply to bona fide executive, administrative, supervisory or professional employees under 803 KAR 1:070 all contain a common salary element that is of relatively minor importance in the present action.  Each exception defined by the regulation requires that the overtime claimant be paid on a salary basis at a rate of not less than $455 per week.  See 803 KAR 1:070 §§ 2(1)(a), 3(1)(a), 4(1)(a), 5(2) (May 2008).  No dispute exists that Jed's salary, computed on a weekly basis, easily exceeded the $455 per week salary basis test included in the exclusions for administrative, supervisory and professional exempt employees under 803 KAR 1:070 (May 2008).  In fact, Jed was among the highest paid of the engineers at the Leitchfield plant according to the former plant manager, David Goodling.  His annual salary during the statutory period, when computed on a weekly basis, approximately doubled the $455 minimum salary basis required of each exemption.  See

46

gen. 803 KAR 1:061 §7(4) (May 2008) (discussing calculation of the weekly salary amount).

Accordingly, Jed cannot show that his salary alone renders the exclusions of 803 KAR 1:070

(May 2008) inapplicable to him.  He will have to show in the case of each exemption that one or

more elements of the exemption do not apply to him given the evidence at trial.


**1.      Bona Fide Supervisor.**

The exemption for individuals employed in a bona fide supervisory capacity is set

forth in 803 KAR 1:070 §5(1), (2) (May 2008).  An individual will only be considered a bona

fide supervisor under the regulation if his or her primary duty consists of customarily and

regularly directing the work of two or more employees where he is employed.  The term

"primary duty" as used in this portion of 803 KAR 1:070 (May 2008) is defined in §15 of the

same regulation to mean "the principal, main, major or most important duty that the employee

performs."  803 KAR 1:070 §15(1)(a) (May 2008).  According to the same regulation, the

determination of any given employee's primary duty must be based on the facts of the particular

case "with a major emphasis on the character of the employee's job as a whole."  Id. The factors

to be considered in this respect according to the regulation include: the relative importance of the

exempt duties compared to other types of duties; the amount of time spent performing the

exempt work; and the employee's relative freedom from direct supervision.  Id.

The same section of 803 KAR 1:070 (May 2008) makes clear that although the

amount of time that is spent performing exempt duties is a useful guide to determine whether

such exempt work may be the primary duty of the employee, "time alone, is not the sole test and

nothing in this subsection requires the exempt employee spend more than fifty (50) percent of

their time performing exempt work."  803 KAR 1:070 §15(1)(b) (May 2008).  In this regard, the courts take a "holistic approach" to determining the exact nature of the primary duties of an employee.  See Renfro, 5 3rd 512, 517 (6th Cir. 2004) (citing Counts v. South Carolina Elec. and Gas Co., 317 F.3d 453 (4th Cir. 2003) (noting that the language and structure of the FLSA call for a 'holistic approach' to determining employee's primary duties and that the court need not engage in a day by day scrutiny of the tasks).

As earlier noted, federal case law that interprets the term "primary duties" makes clear that neither the employee's statements concerning his or duties, nor those of the defendant employer have controlling weight.  Thomas v. Speedway Superamerica, LLC, 506 F.3d 496, 503-05 (6th Cir. 2007).  Likewise, the Sixth Circuit has held in interpreting FLSA that the terms of a job description are not entitled to any special weight in this determination when such terms are not supported by more specific evidence of the employee's actual job duties.  Ale v. Tenn. Valley Authority, 269 F.3d 680, 689-90 (6th Cir. 2001) ("When titles and vague job descriptions are not born out by more specific evidence, they are not entitled to any special weight.  In fact, this type of evidence has been rejected.").  In short there are no "magical incantation[s]" that will render an employee a bona fide administrator, supervisor or professional, despite his or her actual duties.  Ale, 269 F.3d at 691 ("The words 'in charge' are not a magical incantation that render an employee a bona fide executive regardless of his actual duties.").

The second critical term which is an element required to establish a bona fide supervisor under the regulation is the term "customarily and regularly" as used to indicate the frequency of the affected employee's primary duty in directing the work of two or more other employees.  The term is defined at 803 KAR 1:070 §15(2), whereat the regulation explains that

48

"The phrase 'customarily and regularly' shall mean a frequency that shall be greater than occasional but which, may be less than constant." <u>Id</u>.  The same provision of the regulation continues to indicate that the term includes that work which is recurrently performed each workweek and does not include isolated or one time tasks.  <u>Id</u>.  <u>See</u> <u>Renfro</u>, 370 F.3d at 519 (The term "customarily and regularly, as defined in 29 CFR § 541.207(g) signified 'a frequency which must be greater than occasional but which, of course, may be less than constant.'").  <u>See also</u> <u>Schaefer</u>, 358 F.3d at 403-04.

Jed's proof at trial satisfies his burden to show that this exemption does *not* apply given his duties as actually performed.  It is true that Jed did, as part of his environmental coordinator duties, occasionally direct two employees, Ernie Priddy and James Gary, who were assigned to assist Jed with matters involving waste disposal.  Jed, however, was not the supervisor for these two union employees, nor did Jed customarily and regularly direct their work.  Jed's testimony persuades the Court that he had only irregular and occasional interaction with the two men.

In Jed's estimate, he might have directed their work for no more than 40 hours over the course of an entire year.  Even the other Bosch employees who testified at trial did not state that Jed customarily and regularly directed the work of either man, nor did they specify an amount of time of supervision that would have satisfied the regulatory definition found in 803 KAR 1:070 §15(2) (May 2008).  It appears to the Court that Priddy and Gary were simply assigned to assist Jed on an "as needed" basis with issues involving the disposal of plant waste.  Jed was not their supervisor; Curtis Whitehead was.  Jed's primary duty did not involve their supervision, nor did he customarily or regularly direct their work.  Accordingly, Jed satisfied his

burden at trial to persuade the Court that this particular exemption from overtime protection under KRS 337.285(1) does not apply.

### 2.      Bona fide Executive Employee.

Jed also makes a persuasive case that he was not employed in a bona fide executive capacity during the final five years of his employment.  The applicable section of 803 KAR 1:070 requires not only a salary of $450 or more per week, but also that the plaintiff's primary duty be the management of the enterprise or a recognized department thereof, who also "customarily and regularly directs the work of two (2) or more employees *and* has the authority to hire or fire other employees or whose recommendation on hiring and firing will be given particular weight.  See 803 KAR 1:070 § 2(1)-(7) (May 2008).  The record is clear that Jed did not customarily and regularly direct the work of two or more employees; nor did he have the power to hire and fire other employees so as to fall within the exemption to KRS 337.285(1) for individuals employed in a bona fide executive capacity.

Jed had absolutely no authority to hire or fire anyone at the Leitchfield plant.  As he testified, he had no such authority, a fact confirmed by the testimony of the plant's human resource person, Rita Stevenson.  At most, Jed's recommendation apparently would have been considered by management at the plant.  No managerial employee, however, testified that Jed's hypothetical recommendation to hire or fire would have been given any extraordinary weight.  The term "particular weight" is defined under the regulation to involve such factors as (1) whether it was part of the employee's job duties to make such recommendations; (2) the frequency with which the recommendations were made; and (3) the frequency with which the

50

employee's recommendations were relied on by his employer.

Jed's actual job duties did not require him to make such hiring or firing recommendations. He did not do so. Consequently, it cannot be said that his recommendation on who to employ or to discharge would have been given any "particular weight" in the sense that this term is defined by 803 KAR 1:070 §1(6) (May 2008). Jed satisfied his burden to prove that the exemption for bona fide executive employees does not apply to him given the facts.

**3.    Bona fide Professional Employee.**

The exempt category of professional employee is defined in §4 of 803 KAR 1:070 (May 2008). In this section of the regulation, an individual who satisfies the salary basis test, as Jed does, will be considered to be an exempt professional employee if his or her primary duty is the performance of work that (1) requires knowledge of an advanced type in a field of science or learning that is customarily acquired by prolonged course of specialized intellectual instruction; or (2) work that requires invention, imagination, originality or talent in a recognized field of artistic or creative endeavor. 803 KAR 1:070 §4(1)1, 2 (May 2008).

The regulation continues to elaborate at §4(2)(a) that for an employee to qualify as a "learned professional," the employee's primary duty must be the performance of work that requires advanced knowledge in a field of science or learning that is customarily acquired by a prolonged course of specialized intellectual instruction. To fall within this exemption, the affected employee's primary duties therefore must include three things: (1) the performance of work requiring advanced knowledge, (2) that is in a field of science or learning, and (3) the type of advanced knowledge is customarily acquired by prolonged, specialized intellectual

51

instruction.  803 KAR 1:070 §4(2)(a)1-3 (May 2008).

Once again, the regulation goes to great lengths to define its critical terms such as "work requiring advanced knowledge," "field of science or learning," and "customarily acquired by a prolonged course of specialized intellectual instruction."  803 KAR 1:070 §4(2)3(b), 4(d) (May 2008).  For example, "work requiring advanced knowledge" is defined to by the work that is predominately intellectual in nature that requires a consistent exercise of discretion and judgment, rather than routine mental, manual or physical work."  Id.  The affected employee must use his or her advanced knowledge to analyze, interpret or make deductions from facts or circumstances; and, such advanced knowledge "shall not be attained at the high school level." Id.  Next, the phrase "field of science or learning" is by regulation intended to include traditional professions such as law, medicine, accounting, architecture, teaching and engineering."  Id.  The regulation in this regard distinguishes jobs that involve merely mechanical arts or skilled trades which may involve knowledge of a fairly advanced type that is not in a field of science or learning.  Id.

The final and most important phrase for our present purposes is the phrase "customarily acquired in a prolonged course of specialized intellectual instruction."  The regulation makes clear that this phrase is restrictive in nature and is intended to limit the exemption for bona fide professional employees to those employees with specialized academic training for their profession.  803 KAR 1:070 §4(2)3(d).  The regulation specifically advises that "The best *prima facie* evidence that an employee meets this requirement is possession of the appropriate academic degree."  Id.  It continues, however, to include those employees within the scope of the exemption where the employee has "substantially the same knowledge level and

52

performs substantially the same work as the degreed employee, but who attained the advanced

knowledge through a combination of work experience and intellectual instruction." Id.  Thus,

the possession of a professional degree or diploma is not an absolute prerequisite, if the affected

employee has acquired the same level of specialized knowledge in a field of science and learning

by work experience *and* intellectual instruction.  The regulation then immediately cautions that

"the learned professional exemption also shall not apply to occupations in which most

employees have acquired their skill by experience rather than by advanced, specialized,

intellectual instruction." Id.

It is this final qualification, the element of specialized, intellectual instruction,

that calls into serious question the applicability of the learned professional exemption to Jed

Johnston.  The Court otherwise has little problem concluding that Jed's primary duties at the

Leitchfield plant involved work that was predominately intellectual in character and required the

exercise of discretion and judgment, rather than merely the performance of routine mental work.

Although Jed argues otherwise, his own meticulous records consistently show that Jed used his

advanced knowledge of the various manufacturing processes at the plant, acquired over a 35-

year long distinguished career, to exercise discretion and judgment in both the resolution of

engineering problems and in the performance of his environmental responsibilities.

Indeed, even a casual review of Jed's work memos about his troubleshooting and

cost savings recommendations shows time and again that Jed exercised exceptional good

judgment in his efforts to resolve engineering problems of all sorts at the plant.  The Court

cannot discuss each of these various engineering-related memos in detail, but a sampling of them

shows that Jed was not merely a "tabulator" who went about the plant merely collecting data in a

menial fashion.  To the contrary, Jed was given some of the plant's most complex engineering problems to help resolve during the final years of his employment.  He routinely made important and insightful recommendations that, if followed, would have greatly increased the cost savings and efficiency at the plant.  Those memos are discussed more fully in the following section, beginning at page 62.

The Court might be inclined to find that Jed failed to carry his burden to show that he is not a bona fide professional employee, given the above circumstances, except for one essential element of the regulatory definition that the evidence at trial shows was not satisfied. The definition for a professional employee under 803 KAR 1:070 §4(2)(d) makes clear that the learned professional exemption, and in particular, the phrase "customarily acquired by a prolonged course of specialized intellectual instruction," does *not* apply to those occupations in which the employees have acquired their skill by experience, rather than by advanced, specialized, intellectual instruction.  Id.  In other words, those employees who otherwise perform what might properly be determined to be professional responsibilities will not be excluded from the protection of Kentucky's overtime statute, KRS 337.285(1), if the basis for their professional skills, such as engineering skills applied by Jed Johnston, was solely through work experience rather than through any form of intellectual instruction.  Id.

Proof at trial conclusively established that Jed had no formal training whatsoever in engineering, or chemistry for that matter.  Jed's only post-secondary training involved a year of business school.  He did not complete his college studies and has no college degree.  Jed testified that he simply acquired his engineering skills through his long experience at the plant over the course of some 35 years.  Such individuals, by the very terms of the regulation, are not

54

learned professionals.  A learned professional need not have a college or other advanced degree, but he or she must at a minimum have acquired a meaningful portion of their advanced knowledge or technical skills through specialized, intellectual instruction.  Because Jed had absolutely no such specialized, intellectual instruction, he cannot be considered to be exempt from KRS 337.285(1) (West 2007) under the exclusion for bona fide professional employees.

While there are few cases that address this exact issue in the context of an employee performing engineering duties, one such case highlights by contrast the type of employee who, although non-degreed, may still properly be held to be a learned professional and therefore excluded from overtime protection.  The applicable case is Leslie v. Ingals Shipbuilding, Inc., 899 F. Supp. 1578, 1582 (S.D. Miss. 1995).

In Ingals, an engineering specialist responsible for carrying out specialized and novel engineering assignments that involved the control systems on navy ships, brought an action to recover overtime pay arguing that because he lacked a college degree in engineering, and had acquired a portion of his engineering skills through 30 years of work experience, he could not be shown to be exempt from overtime coverage for nonexempt employees under the FLSA.  The district court agreed that the employee did not have a college degree in engineering; however, he had studied engineering for three years at Louisiana State University and had dropped out shortly before he was scheduled to graduate.  In addition, during his 30 years with Ingals, a shipbuilding company, he had attended a number of naval architecture courses.  These facts combined with the nature of his duties which included inspecting problem areas, preparing technical drawings, proposing solutions to the problems identified based on a thorough understanding of structural specifications and standards (duties which took over 50% of his time

55

and required the exercise of independent judgment), all indicated to the court that the plaintiff employee was a bona fide professional exempt from the provisions of the FLSA.  Id. at 1582.

In our case, Jed established that he had absolutely no specialized, intellectual instruction in engineering.  Jed essentially was a self-taught engineer who acquired his formidable skills through his day-to-day work experience at the Leitchfield plant.  In contrast, the plaintiff in Leslie merely happened not to have earned his degree, but did engage in advanced, intellectual instruction along with his extensive experience in naval engineering.  See gen. Dept. of Labor, Wage and Hour Division, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 68 FR 15560-01, 15567-68 (March 2003) (citing the Leslie decision, while observing that "in the modern workplace, some employees acquire advanced knowledge through a combination of formal college-level education, training and work experience, even where other employees in that field customarily acquire advanced knowledge by obtaining a baccalaureate or advanced degree."). Because Jed did not acquire his advanced engineering knowledge through such specialized intellectual instruction, he cannot properly be considered under the state DOL regulations to be an exempt learned professional.  803 KAR 1:070 §4 (May 2008).  Accordingly, Jed has carried his *prima facie* burden to show that this particular exemption for bona fide professional does not apply to him.

**4.      Bona Fide Administrative Employee.**

The final exemption under 803 KAR 1:070 §3 is the exception for bona fide

administrative employees.  The regulation provides, in addition to the salary basis requirement, that the primary duty of such employees must be "office or non-manual work directly related to the management or general business operations of the employer or its customers; and the primary duty must include 'the exercise of discretion and independent judgment with respect to matters of significance.'" 803 KAR 1:070 §3(1)(b)-(c) (May 2008).  The same section of the regulation defines the phrases "directly related to management or general business operations" and discretion and independent judgment."  Id.  The regulation explains that the affected employee must perform work that directly relates to or assists the running or servicing of the business as distinguished from working on a manufacturing production line or selling a product in a retail or service establishment.  803 KAR 1:070 §3(2)(a) (May 2008).

The regulation continues in the next subsection of section 3 to provide a number of examples of the type of work that relates directly to management or general business operations.  Such work specifically is noted to include the functional areas of "tax, finance, accounting, budgeting, auditing, insurance, quality control, purchasing, procurement, advertising, marketing, research, safety and health, government relations, and legal and regulatory compliance.  Id.

The regulation defines the term "discretion and independent judgment" as it relates to the bona fide administrative employee exemption.  803 KAR 1:070 §3(3)(a) (May 2008).  It provides that the exercise of such discretion and independent judgment must involve "the comparison and evaluation of possible courses of conduct, in acting or making a decision after the various possibilities had been considered."  Id.  The term "matters of significance" is defined in the same subsection to mean a reference to the level of importance or consequence of

57

the work involved.  Id.  See 29 CFR §§ 541.2, 541.214 (setting forth the analogous requirements for administrative employee under FLSA regulations).

Under the regulation, the factors to be considered when determining if an employee exercises discretion and independent judgment include: (1) whether the employee has the authority to interpret or implement management policies or operating practices; (2) whether the employee carries out major assignments in conducting the operations of the business; (3) whether the employee performs work that affects the business operations to a substantial degree; (4) whether the employee has the authority to commit the employer in matters that have a significant financial impact; (5) whether the employee has the authority to waive or deviate from standard procedures without prior approval; (6) whether the employee provides consultation or expert advice to management; (7) whether the employee is involved in planning or of long or short term business objectives; and (8) whether the employee investigates and resolves matters of significance on behalf of management.  803 KAR 1:070 §3(3)(b) (May 2008).

The regulation additionally provides that the affected employee must have the authority to make an independent choice free from immediate direction or supervision, although the decisions made by the employee need not be absolutely final or free from further review.  Id.  The employee's independent judgment may be subject to review at a higher level and still satisfy the regulation.  See 803 KAR 1:070 §3(3)(c) ("The fact that an employee's decision may be subject to review and that upon occasion decisions are reversed or revised after review does not mean that the employee is not exercising discretion and independent judgment.").  The exercise of discretion and independent judgment, however, must involve more that merely the use of skill in applying well-established techniques, procedures or specific standards contained in manuals

58

or other sources.  803 KAR 1:070 §3(3)(e) (May 2008).  It also requires more than mere clerical or secretarial work, recording or tabulating data, or performing repetitive, recurrent or routine work.  Id.

Jed maintains that the facts establish that he worked in the performance of his primary duties as nothing more than a tabulator, someone who applied specific standards contained in company manuals to waste-related and other data that he routinely collected.  Jed denied that his primary duties required the routine exercise of discretion or independent judgment, but involved merely repetitive, routine data collection that in terms of the entire Bosch business organization did not involve matters of financial significance given the multi-billion dollar value of Bosch as a going international business.  Accordingly, Jed maintains that he also satisfied his burden of proof to show that the bona fide administrative employee exemption does not apply to him.

The critical question is whether the proof offered at trial supports Jed's arguments.  Jed's primary duties as plant engineer/environmental coordinator involved office work.  Jed agreed in his testimony that he did not perform manual labor.  Union employees primarily performed the manual labor at the plant, not non-union employees such as Jed. Instead, he spent between 70% to 80% of his time at work performing duties that related to his position as environmental coordinator, although in certain respects these duties overlapped with his engineering duties.

The non-manual, office work performed by Jed also related to the "management or general business operations" of Bosch.  The regulation makes clear from its wording that work in such areas as safety and health, along with legal and regulatory compliance, is

59

considered by the Kentucky DOL to be work that directly relates to management or general

business operations.  Certainly, Jed's work as plant engineer/environmental coordinator directly

involved safety and health regulatory compliance.  Jed was responsible to ensure that the waste

from all of the processes at the plant was properly categorized, stored and disposed of in

accordance with various federal, state and local environmental regulations.  Jed's duties required

him to prepare myriad various environmental reports on a weekly, monthly, quarterly and annual

basis.  He additionally investigated the potential for cost savings through the more efficient

treatment and use of waste products and chemicals.  His involvement in the long term project to

close plant 2 in accordance with environmental regulations is a primary example of a major

environmental project assigned to Jed, a project which he in his own memos characterized to be

"challenging and self-rewarding" during the four years that he was responsible for the closure of

plant 2 from 2000 to 2004.  The work examples set forth above clearly constitute work that is

directly related to the management or general business operations of Jed's employer.

Examination of Jed's own reports and memoranda repeatedly demonstrates that in

the performance of his environmental duties, Jed exercised "discretion and independent

judgment" by the comparison and evaluation of possible courses of conduct, along with

recommendations to management on the most efficient, beneficial choice to make.  For example,

Jed prepared a memo on October 1, 1999, to Tim Hess, the plant manager, that contained a

comparison of the cost savings that could be achieved through the use of an environmental

services company in handling the flux dust and wastewater treatment filter cake differently.

Jed's calculations and analysis showed a total cost savings of $3,862.24 that could be achieved

by using the suggested environmental service provider.  (DN 44, Def.'s Exh. 36, memo of Oct. 1,

1999).  Another memo from Jed to Tim Hess dated January 18, 2000, detailed the environmental cost reductions and cost avoidance achieved through several projects that Jed was directly involved with including wastewater discharge reduction, Tioga silver and gold paint reduction, drum compactor for silkscreen towels, and disposal of the aforementioned water filter cake and flux dust.  (DN 44, Def.'s Exh. 40, memo of 1/18/2000).  The next quarterly environmental report prepared by Jed reflected his involvement in environmental training and identifying those environmental programs that required update.  The memo also once again identified the cost savings obtained from changing various service and material providers and carbide sludge recycling.  (DN 44, Def.'s Exh. 41, memo of 4/17/2000).

In his memo of June 12, 2000, Jed specifically identified for Brent Webster the cost reduction programs that he would be working with in 2001.  (DN 44, Def.'s Exh. 43, cost reduction memo of 6/12/2000).  This memo identifies various cost savings in the thousands of dollars to be obtained through switching paint suppliers, offsite treatment and disposal of waste streams, relocation of waste containers and request approval from city authorities to add carbide coolant to the wastewater discharge.  The memo also mentions such projects as requesting the coolant supplier to furnish improved coolant without additive products, the elimination of an electric meter at plant 1, the elimination of rust on blades and equipment, purchase of a washer and filter system to eliminate oil from blade blanks, and the addition of a gas oven to expand capacity.  The same type of evaluation of possible courses of conduct relating to waste disposal and environmental matters can be found in Jed's "Ideals [sic] for Production Cost Savings" memo dated 8/10/2000.  (DN 43, Def.'s Exh. 46, memo of 8/10/2000).

Examination of these memoranda and others found in the exhibits of the

61

Defendant shows that Jed did exercise discretion and independent judgment on a regular basis in the performance of his duties as plant engineer/environmental coordinator.  Indeed, had Jed been the type of mere tabulator that he now claims to have been, it is highly doubtful that he would have been involved in any of the projects listed on the various memos that he prepared.  Jed was responsible for these projects because he was *not* a mere tabulator, but rather was a highly experienced, analytical and self-directed employee who was an excellent troubleshooter that had made valuable contributions throughout his career at the plant.  The fact that his recommendations on important matters such as the purchase of new Clean-o-mat washers or the Hyde filtration system, were subject to approval does not mean that he was not exercising discretion and independent judgment.

Jed also was instrumental in using his advanced knowledge to help resolve the ongoing, serious paint problem known as "paint orange peel."  (Def.'s Exh. 13, memo dated 1/10/02).  As Jed's memo relates, he repeatedly went to the manufacturing floor to assist with troubleshooting, sometimes spending an entire day observing the blades going through the various paint related processes to determine why some of the blades had the orange peel and some did not.  Jed did not act merely as a tabulator, nor did he simply monitor the process.  To the contrary, his memorandum shows that he had several trial lots of blades processed "to help analyze and troubleshoot the paint issues."  (Id. at 1).

His memo contains a detailed analysis of the rejection rates for various lots of blades run through different processes.  (Id. at 1-2).  After conducting these trial lots and consulting with various outside experts, it was determined that the problem causing the orange peel was caused by oil left on the blade blanks due to the inability of the existing Clean-o-mat

washers to adequately remove sufficient oil.  When the oily blade blanks were run through the acid dip line, the oil remaining on the blades prevented the paint from flowing properly over the surface, thereby causing the orange peel problem.  Jed's memo not only identified the problem, it then continued to reflect the short term actions that had been taken to address the problem and made a long term recommendation for the purchase of new Clean-o-mat washers.

This memo from Jed satisfies the criteria for the administrative exemption.  This was clearly a matter of quality control. Jed researched the problem, used independent judgment, compared and evaluated the process, and made a decision as to a fix which he recommended to his employer.  The problem was substantial in the operation of the business and had a significant financial impact.  Jed's expert advice was followed by the company and resolved a matter of significance for management.  Many of Jed's other engineering related memos evidence the same.

Another good example is provided by Jed is found in his memo on blank flatness issues involving the 400 ton blanking press.  (DN 42, Def.'s Exh. 15, memo dated 6/17/03).  The memo reflects that the plant manager Gary Skaggs requested that Jed assist the other engineers in troubleshooting problems involving the flatness of blades coming out of the 400 ton press. Jed's memo succinctly related the problems to the improper clearance in diamond arbor tooling and spanking die issues.  (Id.)  The Court will not relate all of the highly technical details contained in Jed's well-organized memo.  Essentially, there was too much clearance with the arbor punch and button tooling so that the equipment operator faced the problem of the diamond arbor either falling out or failing to break out.

Jed's blanking press memo identified the problem and noted that the tolerances

63

proposed by another plant engineer for the punch and button clearance tooling were incorrect. He even noted that the method being used to check for diamond arbor breakout was misleading. Jed specifically recommended that a particular instrument display on the press either be repaired or replaced so that the equipment operators could change steel thickness more readily.  Id.  The memo then proposes various tasks for different employees to assist in correcting the problem.

Once again, a major engineering related problem was directly addressed by Jed, with the help of other engineers and the equipment operator involved.  Jed communicated with the equipment operator, used his extensive knowledge of the manufacturing process to identify the problems, not only with the equipment, but also the means used to calculate the correct tolerances.  He proposed not only the selection of the correctly identified tolerances, but also a specific repair to improve the operator's ability to more efficiently run the 400 ton blanking press.  All of these features in the memo readily meet the criteria for the type of duties that an administrative employee would perform.  See 803 KAR 1:070 §3 (May 2008).

Jed also as part of his engineering duties made several formal requests for major capital expenditures of an important nature to the plant.  He requested a $133,310 purchase of two Clean-o-mat washers to permanently address the oily blank problem.  (DN 42, Def.'s Exh. 18).  The capital expenditure request prepared by Jed analyzes the situation and risk, presents alternatives, includes a cost savings analysis, along with a detailed calculation of the annual amount of labor hours reduced by purchase of the equipment.  (Id.).  Jed prepared a similarly detailed, technical capital expenditure request for the purchase of the Hyde ultra filtration system for $43,130.  (DN 44, Def.'s Exh.42).  This separate request included all of the same analytical contents of the earlier expenditure request.  These documents, along with certain others from

64

Jed's records, reflect his intellectual use of advanced knowledge in the exercise of his discretion and judgment to resolve quintessential engineering problems in the manufacturing process.

Jed used the same type of advanced knowledge of engineering related technical matters, discretion and independent judgment in regularly proposing various cost savings changes at the plant through the purchase or repair of equipment, or by changing suppliers of various chemicals or paints involved in the manufacturing process. The Court will not go document by document to confirm the type of cost savings proposals regularly made by Jed. The exhibits introduced at trial repeatedly show his use of engineering knowledge to propose major cost savings. Without reciting every such proposal introduced into evidence, it is clear that Jed's proposal and analysis to change paint suppliers for silver and gold paints from Tioga to Wabash is a classic example of the use of advanced technical knowledge to perform a comparative cost analysis, taking into account quality issues, for a calculated savings of $111,626. (DN 43, Def.'s Exh. 46, production cost savings memo of 8/10/2000). Other such examples include Jed's comparative analysis of the cost savings produced by changing from an electric paint cure oven to a gas fired oven in plant 2. (Id., Def's Exh. 48, gas cure oven memo of 11/16/2000).

Section 3 of 803 KAR 1:070 (May 2008) makes it clear that the employee need not have unlimited authority or a complete absence of review in order to exercise independent judgment. Even if an employee's decision or recommendation is reviewed at a higher level, the employee may still qualify as a bona fide administrative employee. See 803 KAR 7:010 §3(3)(c) (May 2008). Accordingly, it appears to the Court that Jed meets all of the regulatory requirements for a bona fide administrative employee who is exempt from overtime protection under KRS 837.285(1).

Several facts confirm the correctness of this conclusion.  First, the very language of the regulation strictly reinforces the notion that an individual with Jed's duties is exactly the type of exempt worker who qualifies as a bona fide administrative employee.  The regulation provides a series of specific examples of exempt administrative employees.  See 803 KAR 1:070 §3(4)(a)-(j) (May 2008).  Among the specific examples included in the regulation is "an employee who leads a team of other employees assigned to complete major projects for the employer (such as purchasing, selling, or **closing all or part of the business** ...).  803 KAR 1:070(3)(c) (May 2008)(emphasis added).

The trial record confirms without dispute that Jed was the individual responsible for overseeing the closure of plant no. 2.  This operation was a major undertaking that occurred over four years through various phases.  Jed himself characterized the project as being challenging and rewarding.  Several of the former plant managers who testified indicated that Jed was instrumental in obtaining the closure of plant no. 2.  Accordingly, the very task that Jed acknowledged consumed the bulk of his time during his final years of employment is listed in the Kentucky regulation as an example of one type of primary duty that falls within the exemption for bona fide administrative employees.

The second factor that persuades the Court that Jed is a bona fide administrative employee and thus exempt from the overtime protections of KRS 337.285(1) is the FLSA case law of the Sixth Circuit.  Several published decisions reinforce the notion, either directly or by contrast, that Jed's primary duties involved non-manual work directly related to the management and general business operations of Bosch that involved the exercise of discretion and independent judgment in matters of significance to the company.  One such decision is Renfro v.

66

Indiana Michigan Power Co., 370 F.3d 512 (6th Cir. 2004).

In Renfro, two employees brought claims against their employer, AEP, which operated a Michigan nuclear power plant, alleging that they were entitled to unpaid overtime wages under the FLSA, 29 U.S.C. §§ 201-219 (2000).  The plaintiff employees worked for AEP as "planners" whose job it was to take job orders for maintenance or new construction and prepare work packages that the company's hourly wage craft workers would use to perform the requested work.  Id. at 514.  In performing their duties, the two employees would determine which plant procedures to apply to particular repairs and would identify any permits needed to allow the repair work to be performed.  Id.  Their employer, AEP, argued successfully in the district court that the two men were bona fide administrative employees exempt from the FLA's overtime protections under 29 U.S.C. § 213(a)(1).  Id. at 515.

The planners had conceded that much of their work was performed at a desk, although they did perform some manual work referred to as "field walk-downs" to assess the progress of repair projects they had planned.  Id. at 517.  The court noted that this occasional manual work did not automatically remove the plaintiff employees from exempt status so long as the work was directly related to the exercise of the plaintiffs' discretion and independent judgment.  Id. (citing 29 CFR § 541.203(b)).  Accordingly, given the plaintiffs' acknowledgment that they performed most of their work at their desk, and that their duties were generally office based, rather than manual, the Sixth Circuit agreed with the district court that the "field walk-downs" did not automatically remove the plaintiffs from the category of exempt administrative employees.

The Sixth Circuit in Renfro then addressed the question of whether the two

67

plaintiffs' duties were directly related to management policies or general business operations. Id. at 517 (citing 29 CFR § 541.2(a)(1)).  The court noted in this regard that work concerning the administrative operations of the business includes "'work performed by so-called white-collar employees engaged in "servicing" a business, as for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.'" Id. (citing 29 CFR § 541.205(b)).  The plaintiffs had argued that their work was not truly administrative in nature, but was rather a maintenance function that best fell under the category of production, rather than the administration of the business.

        The court discussed the administrative/production dichotomy.  Based on this analysis, it concluded that the planners' primary duty was to create plans for maintaining equipment and systems at the nuclear power plant.  Because this primary duty was ancillary to AEP's principal production activity, which was generating electricity, the court in Renfro held it to be administrative.  Although the duties of the planners were "not precisely 'administrative,' the court held that the planners' duties were the type of 'servicing' (advising the management, planning, etc.) that the FLSA deems administrative work directly related to AEP's general business operations." Id. at 518 (citing 29 CFR § 541.205(b)).  See gen. Cowart v. Ingals Shipbuilding, Inc., 213 F.3d 261, 267 (5th Cir. 2000) (senior planners who performed predominantly intellectual work in determining the production work requirements at their employer's shipyard in evaluating work requirements, establishing priorities for assigned work and providing guidance so that work schedules could be met, were properly held to be exempt administrative employees under the FLSA).

        In Renfro, the plaintiff employees also argued that their work, even if

68

administrative in nature, was not of "substantial importance to the management or operation of the business" because their duties were standardized and did not involve setting company policy or performing major assignments.  Id. at 518 (citing 29 CFR §541.205(a)).  The Sixth Circuit directly rejected this argument noting that the planners' work - - interpreting and carrying out plant policies, creating plans that permitted the continued operation of the equipment and systems that generate AEP's main product - - affected AEP's general business operations to a substantial degree.  Id. (citing <u>Haywood v. North American Van Lines, Inc.</u>, 121 F.3d 1066, 1072 (7th Cir. 1997) (employee's work as customer service representative for moving company was "important to the success of the firm" and therefore exempt).  The Sixth Circuit continued in its analysis in <u>Renfro</u> to note that even the plaintiff planners agreed that their work was crucial to keeping the nuclear power plant in compliance with its licensing requirements.  Id.  Accordingly, it rejected this argument as well.

Finally, the planners in <u>Renfro</u> argued that they lacked sufficient discretion or independent judgment due to the heavily regulated nature of their primary job duties within the nuclear power industry.  The Sixth Circuit also rejected this argument in the following material language:

> The process of generating repair work packages is neither wholly mechanical nor restricted to 'merely applying knowledge in following prescribed procedures.' 29 CFR § 541.207(c)(1).  When there is no procedure that can be applied to a particular task, the planners independently determine the nature of the repair task and prepare a repair plan.  In those situations, planner use their own skill, experience, judgment and discretion in formulating their repair solution.  Additionally, the planners exercised independent decision making when choosing among various options to remedy a problem - - for example, determining whether to replace or repair equipment.  The deposition evidence demonstrates that the planners make such independent decisions and exercise judgment

69

on a daily basis.

Id. at 519.  Accordingly, the Sixth Circuit held in Renfro that because the planners' primary duty

of problem solving required them to exercise discretion and independent judgment customarily

and regularly, the district court properly entered summary judgment for their employer AEP on

the basis that the planners were bona fide administrative employees exempt from the overtime

provisions of the FLSA.

      This analysis in Renfro is directly applicable to the present case.  Jed, like the

planners in Renfro, was an office employee who routinely worked on major projects in his

capacity as plant engineer/environmental coordinator and used his extensive experience in

independent decision making to remedy serious problems of various natures including the repair

and replacement of essential manufacturing equipment and processes.  His regularly performed

duties had a major impact on the operation of the Leitchfield plants as reflected in the cost

savings that Jed helped obtain, the successful troubleshooting that he regularly performed, and

the important environmental compliance duties that he took on as a major part of his duties as

plant engineer/environmental coordinator.  Just as with the planner in Renfro, Jed helped

establish procedures for particular job operations and critical repairs and also routinely worked

with management to improve efficiency throughout a broad range of operations at the plant.  His

situation therefore is highly analogous to that of the two exempt administrative employee

planners in Renfro.

      Another helpful case from the Sixth Circuit to understanding Jed's proper

employment classification is Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 404-406 (6th

Cir. 2003).  Schaefer involved an FLSA action for unpaid overtime brought by an environmental

specialist against the same employer defendant in <u>Renfro</u>, AEP, the operator of the Michigan nuclear power plant.  Once again, AEP argued that the employment specialist, who allegedly had overall responsibility for the [plant's] waste disposal program, was an exempt administrative employee not entitled to overtime pay.  Although the district court found on behalf of AEP based on its analysis of the plaintiff environmental specialist's duties, the Sixth Circuit concluded that genuine issues of material fact existed as to whether the employee actually exercised discretion and independent judgment.

       In discussing this issue, the Sixth Circuit addressed two examples of job duties that it concluded were such an exercise of independent discretion; however, because it could not determine whether the two duties (preparation of "condition reports" and benchmarking) related to the plaintiff's primary duties as environmental specialist, it reversed summary judgment and remanded the case to the district court for further proceedings.  <u>Schaefer</u>, 358 F.3d at 405-06.  Benchmarking as described in <u>Schaefer</u> involved the plaintiff contacting other employees at various nuclear power plants to discuss and compare how the other facilities handled particular environmental issues.  Based on these discussions, the plaintiff in <u>Schaefer</u> would then narrow the options for action based on what was feasible at his own power plant, presenting the options to his supervisor, sometimes accompanied by a recommendation about the preferred option.  <u>Id</u>. at 406.  This "benchmarking" was considered by the Sixth Circuit to be an example of a task that "undisputedly require[s] the exercise of discretion...."  <u>Id</u>. at 405.

       The plaintiff in <u>Schaefer</u> also prepared condition reports as part of AEP's corrective action program.  As the opinion describes such reports, whenever a problem arose, something adverse to quality, whether large or small, all AEP employees were expected to

71

address the problem in a condition report that included sections on condition identification, condition evaluation, proposed actions and actual actions that had been taken to address the problem.  Id. at 406.  The Sixth Circuit in Schaefer observed that certain of these condition reports "no doubt have required that Schaefer exercised discretion and independent judgment." Once again, however, because the Sixth Circuit could not determine the percentage of time that the plaintiff spent preparing such reports, or benchmarking, and could not conclusively resolve from the known facts whether these duties related to his primary duty, the court returned the case to the district court for further fact-finding proceedings.

Here, we have an entirely different situation procedurally speaking.  Jed's case has been tried to conclusion.  There is no doubt in the Court's mind concerning the nature of his duties.  Further, Jed's duties in contrast to those of the plaintiff in Schaefer, routinely involved preparing the equivalent of condition reports on a broad range of both environmental and engineering issues.  Examination of these reports, which the court has previously discussed above, convincingly shows that Jed used excellent discretion and independent judgment to address critical problems, both environmental and manufacturing, on a regular basis.  Indeed, the essence of Jed's value to Bosch was found directly in his ability to independently evaluate, analyze problems, propose solutions and make sound recommendations to the management team for the successful resolution of problems and increase in efficiency at the plant.  Schaefer therefore provides two good examples of exactly the type of duties that require the exercise of discretion and independent judgment, duties that Jed Johnston routinely performed in his capacity as plant engineer/environmental coordinator at the Leitchfield plant.

In light of the above federal case law and state regulatory provisions, the Court is

72

forced to conclude that Jed has failed to carry his burden under Kentucky law to show that the exemption for bona fide administrative employees does not apply to him given his primary duties as he performed them.  This conclusion is not something casually made.  The Court has carefully reviewed the entire record in this matter, as well as the controlling regulations, statutes and cases.  Ultimately, the facts simply and repeatedly demonstrate that Jed as plant engineer/environmental coordinator performed work that rendered him exempt from the overtime protections of KRS 337.285(1) as a bona fide administrative employee.

Although the Court is convinced of the correctness of this legal conclusion, it feels compelled to offer the following observations gleaned from presiding over Jed's 4-day long trial.  Not all matters that are important are limited to the highly technical terms of regulations, statutes and case law.  At some point, courts are bound to comment upon inherent matters of a fundamental nature that go beyond the seemingly endless statutes, regulations and decisions that jurists are often by necessity preoccupied with in the performance of their duties.

There is a larger picture to be appreciated from the facts of this case.  This picture is in some senses disturbing in its nature.  Jed Johnston is a man who dedicated his entire adult life to the successful performance of his employer's business at the Leitchfield plant.  He worked tirelessly to invent new saw blades, improve efficiency and assist his employer and fellow employees.

For whatever reason, the company chose a new direction and brought in Webster and others.  Jed lost some of his autonomy and felt, perhaps rightly so in some instances, that he was no longer appreciated for his past contributions.  More and more responsibility was piled on, requiring him to work even longer hours for the same pay.  Jed was forced out of an engineering

73

design job for which he seemed ideally suited, had a proven record of success and was enthusiastically working at to make Bosch more profitable.  Nevertheless, Jed persevered and remained on the job until almost the last day of the remaining Leitchfield plant.

While Jed has the sympathy of the Court, Bosch at least for today has the law. Sympathy is not a basis upon which the Court can properly render a judgment.  The law, and only the law, is an appropriate basis for a judgment.  In this case, given the facts presented, the law requires the Court to hold that Jed Johnston has failed to make his *prima facie* case that he is not an exempt, bona fide administrative employee under 803 KAR 1:070(3) (May 2008). Accordingly, the Court shall enter a separate judgment that dismisses the Plaintiff's case with prejudice.[5]

Copies to Counsel of Record

---

[5]  Because the Court has determined that Jed did not make his *prima facie* case that he is an employee for the purposes of KRS 337.285 (West 2007), no need presently exists to address the questions related to the proper calculation of any alleged overtime pay due him.

74